# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND
### SOUTHERN DISTRICT

| | |
|---|---|
| DENISE VENERO,<br>SOPHIA VENERO,<br>STEPHANY VENERO,<br>Individually and on behalf of all persons<br>similarly situated,<br>c/o Attorney Rebekah Lusk<br>LUSK LAW, LLC<br>113 E. Church St.<br>Frederick, MD 21701<br><br>        Plaintiffs,<br><br>    v.<br><br>PRINCE GEORGE'S COUNTY,<br>MARYLAND,<br>1301 McCormick Drive, Suite 4100<br>Largo, MD 20774<br><br><br>EDWARD L. JEFFERSON, in his official<br>and individual capacity<br>1301 McCormick Drive, Suite 4100<br>Largo, MD 20774<br><br>TERRI LITTLEJOHN, in her official and<br>individual capacity<br>1301 McCormick Drive, Suite 4100<br>Largo, MD 20774<br><br>TANYA ROBERTS, in her official and<br>individual capacity<br>1301 McCormick Drive, Suite 4100<br>Largo, MD 20774<br><br>JACOB C. COOKE, in his official and<br>individual capacity<br>1301 McCormick Drive, Suite 4100<br>Largo, MD 20774<br><br>        Defendants. | CASE NO.:<br><br><br><br>**CLASS ACTION VERIFIED<br>COMPLAINT**<br><br>**[JURY DEMAND ENDORSED<br>HEREON]** |

**"Individual freedom finds tangible expression in property rights."[1]**

Plaintiffs Denise Venero, Sophia Venero, and Stephany Venero, by and through counsel, hereby file their Complaint and Jury Demand and respectfully allege as follows:

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983.

2.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to grant the declaratory relief requested herein pursuant to 28 U.S.C. § 2201(a).

4.      Jurisdiction supporting Plaintiffs' claims for attorneys fees is conferred by 42 U.S.C. § 1988.

5.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391.

## PARTIES

6.      Plaintiff Denise Venero is an individual and a resident of the State of Maryland.  Ms. Venero co-owns two dogs named Bella and Mimi, with her sisters Sophia Venero and Stephany Venero.

7.      Plaintiff Sophia Venero is an individual and resident of the State of New Jersey, and she co-owns two dogs named Bella and Mimi, with her sisters Plaintiffs Denise Venero and Stephany Venero.

---

[1] *United States v. James Daniel Good*, 114 S. Ct. 492, 505 (1993).

8.      Plaintiff Stephany Venero is an individual and resident of the State of Maryland.  Ms. Venero co-owns two dogs named Bella and Mimi, with her sisters Sophia Venero and Denise Venero.  Stephany Venero owns the house that Defendants' seized Plaintiffs' dogs from.

9.      Defendant Prince George's County, Maryland (the "County") is a municipal corporation formed under the laws of Maryland. The County is sued for declaratory, injunctive, and monetary relief.

10.     Defendant Edward L. Jefferson is a Citizens Services Specialist for Defendant Prince George's County.

11.     Defendant Terri Littlejohn is the Assistant Associate Director of Prince George's County Animal Services Facility and overseas the Animal Services Facility.  Defendant Littlejohn supervises Defendants Cooke and Roberts.

12.     Defendant Jacob C. Cooke is an animal control officer for Defendant Prince George's County.

13.     Defendant Tanya Roberts is an animal control officer and is the Animal Control Officer Supervisor at Prince George's County, Maryland. Defendant Roberts supervises Defendant Cooke.

## CLASS ALLEGATIONS

### CLASS

14.     Plaintiffs bring the claims in this action, on behalf of themselves and all others similarly situated, as a class action under Federal Rules of Civil Procedure 23(a)(1)–(4) and 23(b)(2)–(3).

15.     The class that Plaintiffs represent is composed of (1) persons whose animals were seized and impounded by Defendants and not provided notice of an impoundment hearing, and not provided an impoundment hearing; and (2) persons whose animals were seized and impounded

3

by Defendants and not provided a prompt post-seizure hearing; (3) persons whose dogs were seized and impounded based upon being designated as a "pit bull."  There are common questions of law and fact affecting the class represented by the Plaintiffs regarding the retention of animals and the procedures the county employs in releasing animals from Animal Control.

16.     *Numerosity* — Joinder of all members of the Plaintiff Class is impracticable because the class is so numerous both as to those whose dogs were previously so impounded, and, as to those who will hereafter become so aggrieved. *See* Fed. R. Civ. P. 23(a)(1).  The exact size of the Plaintiff Class is currently unknown however Defendant Cooke has informed Plaintiff Sophia Venero that there are at least eight additional dogs who upon information and belief, were impounded for bite issues, and have owners that still have not received due process, and whose dogs are being kept from them by Defendants.  These eight dogs do not include the unknown number of dog owners from the prior years, whose dogs have been seized as being pit bulls for which seizure is not authorized by law, that have not been given due process, and the additional dogs that will be illegally seized and/or impounded in the future without due process. The Plaintiff Class is therefore sufficiently numerous to make joinder impractical. *See Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990) (holding that a court "may certify a class even if it is composed of as few as 14 members.").

17.     *Commonality* — The cases of the named Plaintiffs and members of the proposed class raise identical and common questions of law and fact concerning the complete lack of any rules, regulations, standards, guidelines or procedures for the interpretation or enforcement of the animal laws, which results in i) all of the Defendants' ACOs exercising unfettered discretionary authority to continue to seize and hold Plaintiffs' dogs following an alleged bite incident and in deciding to issue restraint or disposal orders, and ii) the denial of Plaintiffs' rights to a prompt post-seizure, pre-judgment probable cause hearing regarding the warrantless seizure and

retention of their dogs in violation of the Fourth and Fourteenth Amendments to the United States Constitution. *See* Fed. R. Civ. P. 23(a)(2).

18.     *Typicality* — The due process claims of the named Plaintiffs are typical of those of the class, and it is expected Defendants will raise the same defenses to the claims. *See* Fed. R. Civ. P. 23(a)(3). The named Plaintiffs' claims are typical of the claims of the class because the named Plaintiffs and all class members were or will be affected in the same manner by the Defendants seizing and holding their dogs without providing any hearing in a meaningful time or otherwise, to challenge the continued seizure of their property. The injunctive and declaratory relief sought by the named Plaintiffs is also typical of the class because the nature of the violations experienced, extended unreasonable seizures without any process to challenge them, are similar to those suffered by all members of the class.

19.     *Adequacy* — The named Plaintiffs will adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(4). Each named Plaintiff is a member of the class, his or her claims are coextensive with those of the class, and their interests do not conflict. Moreover, the named Plaintiffs and the class are represented by the same attorney and the general counsel for The Lexus Project, Inc. ("Class Counsel")—a 501(c)(3) not-for-profit corporation experienced in and specifically chartered for the litigation of the rights of dog owners whose dogs are alleged to be dangerous. Class Counsel intends to prosecute this action vigorously for the benefit of the entire class.

20.     *Fed. R. Civ. P. 23(b)(2)* — Plaintiffs are entitled to injunctive and declaratory relief declaring the actions of Defendants unconstitutional as applied by failing to grant the named Plaintiffs a prompt post-seizure, pre-judgment probable cause hearing, in that the named Defendants were acting pursuant to local custom, usage, practice or policy, as well as purportedly pursuant to Prince George's County Ordinances, which vests unfettered discretion in

the municipal defendants' animal control officers to seize dogs without rules in an arbitrary and capricious manner, and which does not require municipalities to provide post-seizure, pre-judgment probable cause hearings or any process to timely challenge the seizure. As all of the foregoing applies to all members of the proposed Defendant Class, declaratory and injunctive relief against the Defendant Class as a whole is thus appropriate. *See* Fed. R. Civ. P. 23(b)(2).

### THE HUMAN-ANIMAL BOND

21.     The human-animal bond presents a fundamental property and/or liberty interest protected under the state and federal constitutions.

22.     The American Veterinary Medical Association summarized the findings from a 2006 survey of 50,000 companion animal guardians, which revealed that "[most] people consider their pets to be family members or companions, not property.  The statistics reveal that almost all pet owners feel a strong human-animal bond." *Human-Animal Bond Boosts Spending on Veterinary Care,* JAVMA News, Jan. 1, 2008, http://www.avma.org/onlnews/javma/jan08/080101a.asp. According to the survey, 49.7 percent of guardians viewed their companion animals as "family," while another 48.2 percent considered them "companions." *Id.* Only 2.1 percent of those surveyed viewed their companion animals as property. *Id.* This change in attitude has developed over the last 30 years, evidencing a major shift in the public's attitude toward companion animals. *Id.* There are over 150 million cats and dogs in this country living with humans in homes - one for every two Americans. *Id.;* see also William C. Root, "*Man's Best Friend":  Property or Family Member? An Examination of the Legal Classification of Companion Animals and its Impact on Damages recoverable for their Wrongful Death or Injury,* 47 Vill. L. Rev. 423, 423 (2002).

23.     Recent studies show that 45 percent of dog owners take their dogs on vacation; more than half the companion animal owners would prefer a dog or a cat to a human if they were stranded on a deserted island; and 50 percent of companion animals owners would be "very likely" to risk their lives to save their companion animals, while another 33 percent would be "somewhat likely" to put their own lives in danger to save their companion animals. *Id.* In addition to the personal value of companionship that animals offer, studies over the last two decades have confirmed the health benefits derived from human-animal companion relationships.

24.     Considerable evidence indicates that animal companions prolong life and help reduce the frequency of serious disease. *E.g.,* Gregg A. Scoggins, D.V.M., Note, *Legislation without Representation: How Veterinary Medicine Has Slipped Through the Cracks of Tort Reform,* 1990 U. Ill. L. Rev. 953, 973 (1990), citing to several studies demonstrating the benefits of animals in the treatment of handicapped children, the mentally impaired, and the elderly, and showing that the presence of animals has the effect of lowering blood pressure and heart rates. These data further establish that companion animals provide a compensable benefit and are a unique kind of property whose loss cannot and should not be valued like inanimate items of property.

25.     The effects on people interacting with dogs has been well documented. *Friedmann et al.* reported that children's blood pressures lower while resting with a dog and while reading with a dog (Social Interaction and Blood Pressure: Influence of Animal Companions, in *The Journal of Nervous and Mental Disease*, Vol 171, No. 8, 1983), and *Braun et al.* reported similar findings with adults (Physiological Effects of Human/Companion Animal Bonding, in *Nursing Research*, Vol. 33, No. 3, 1984). *Friedmann et al*. also reported a strong connection with pet ownership and

7

survival one year after a heart attack (Animal Companions and One-Year Survival of Patients After Discharge From a Coronary Care Unit, in *Public Health Reports*, Volume 95, No. 4, 1980).

26.     Several U.S. colleges and universities include study of the human-animal bond in their coursework. Some offer a single course, while others offer a certificate program. All may be found in a variety of disciplines. The surprisingly large number of colleges – including highly respected institutions – reflects a growing acceptance of the key role that animals play in our lives.

27.     In 1975, the National Institutes of Health commissioned research entitled "The Human Health Responsibilities of Veterinarians," which was the first official recognition of the triangular interrelationships among people, their veterinarians, and their pets (www.argusinstitute.colostate.edu/history.htm, accessed on 8/7/2007).

28.     In 1999, three organizations (the American Veterinary Medical Association, the American Association of Animal Hospitals, and the Association of American Veterinary Medical Colleges) commissioned an economic study, a significant portion of which addressed the human-animal bond in depth. The study concluded that, "in veterinary practice, recognition of the human-animal bond is an important determinant of successful practice" (www.argusinstitute.colostate.edu/history.htm, accessed on 8/7/2007).

29.     These above examples demonstrate that the bond between a companion animal and a human animal is real and capable of empirical study and analysis. In addition, the human-animal bond is recognized to have financial business implications as well as personal emotional influence.

30.     Research goes further in the study of this bond. We might anticipate and expect that scientists involved in laboratory animal research remain emotionally distant from their subjects,

if for no other reason than self-protection. However, the Institute for Laboratory Animal

Research Journal in 2002 devoted an entire issue to the *Implications of Human-Animal*

*Interactions and Bonds in the Laboratory,* ILAR Journal Vol. 43 (1) 2002. Kathryn Bayne,

D.V.M., reports in her article, *Development of the Human-Research Animal Bond and Its Impact*

*on Animal Well-being* that the bond between animal and human is based on affection and/or

respect:

> In the research environment, it is not uncommon for a bond to
> develop between the investigator, veterinarian, and/or animal care
> technicians and the animals with which they work . . . .
> Circumstances that foster the formation of these bonds include the
> close and frequent contact between the researchers and their animals
> , . . . the dependency of the animals on the animal care staff for their
> daily needs . . . .

31.     Dr. Bayne also notes that special bonds can form with certain animals. "A strong

contributing factor to the development of a bond is commitment to the animal," in caring for the

animal, recognizing the animal's individuality, training the animal, and talking to the animal

(http://dels.nas.edu/ilar_n/ilarjournal/43_1/Development.shtml, accessed on 8/7/2007).

32.     In fact, a 2001 American Animal Hospital Association survey reported that 44 percent of

pet owners would spend $3000 or more to save their pet's life, and 21 percent would travel 1000

miles or more to obtain specialty care for their pet. A Pfizer Animal Health/Gallup Organization

Dog Owner survey reports that more than 75 percent of pet owners say their dog's health is as

important to them as their own (http://www.argusinstitute.colostate.edu/hab.htm, accessed on

8/7/07). These kinds of owner attitudes reflect that owners are willing to demonstrate

behaviorally that they believe their relationship with their dog is one-of-a-kind.

33.     This relationship between a companion animal and a human animal is bidirectional.

Tannenbaum describes this as a relationship that benefits both parties and is mutually voluntary

(*The health benefits of pets*. NIH Technology Assess Statement Online 1987 Sep 10-11 [accessed 8/7/07]; (3)). From the time a person brings an animal into his/her household, the two interact with and affect each other. The training that the person provides, caring for the dog's daily needs, taking the dog with her to work and on outings, talking with the dog – all serve to strengthen the bond bidirectionally. The more attention an owner gives to a dog, the more likely that dog is to communicate behaviorally in response. This two-way interaction will mold itself into a personalized, unique relationship, and the relationship has the potential to grow.

34.    The above allegations are illustrative only of the empirically and methodologically demonstrable human-animal bond. More recent and ongoing scientific evidence amplifies and further develops these tenets of long-standing scientific acceptance.

## FACTUAL ALLEGATIONS

35.    Plaintiffs own two dogs named Bella and Mimi.

36.    Bella is an eight year old Labrador Retriever Mix that was adopted from the Montgomery County Animal Services in 2014.

37.    Bella is microchipped.

38.    Prince George's County Department of the Environment, Animal Services Facility issued a renewal dog license to Bella on September 13, 2021, with License Number 12104.

39.    The Dog License Application states that Bella's "Predominant Breed" is "Mixed Breed."

40.    Bella has been legally registered in Prince George's County since 2014.

41.    Bella has health problems which require her to be treated with medication, and is on a special diet as a result of her condition.

42.    Mimi is four years old and her dad is a Yorkshire Terrier/Havanese and her mom is a Labrador Bulldog.

43.     Mimi was rescued from a neighbor.

44.     Mimi has also been licensed in Prince George's County since 2017, however, the County was unable to find her paperwork, so on July 5, 2022 a new dog license was issued for Mimi.

45.     The license receipt states that Mimi is a "S. Mastiff, Brown white dog".

46.     The Banfield Pet Hospital Medical Summary Report, dated 3/19/2022 identifies Mimi as a "Terrier, Yorkshire."

47.     Both dogs are female and have been spayed.

48.     On July 4, 2022 the gate separating Plaintiff Denise Venero's property was not closed fully, and Bella and Mimi escaped from the yard when they heard a neighbor's dog barking.

49.     Plaintiff Denise Venero's property has a fenced in yard for the dogs, and the gate which was not fully closed has now been modified with a self-closing mechanism to ensure that the gate will always close on its own.

50.     Plaintiffs have never had any issue with being unable to restrain their dogs.  They are well behaved and listen to them.  They can control the dogs, and there are no issues related to that.  This was human error and it will never happen again because the gate has been modified to now close automatically.

51.     Plaintiffs' father immediately followed the dogs in his car, and other family members went on foot to retrieve the dogs.

52.     Bella and Mimi, and the neighbor's dog – which was tied to a tree – got into a fight.

53.     All three dogs had wounds from the fight.

54.     When Plaintiff Denise Venero approached the neighbors she encouraged them to get medical care for their dog.

55.    Plaintiff Denise Venero was bitten by the neighbor's dog when she approached it to check on its injuries, after asking the owners for permission to check out their dog.  The reason being is that the owners of that dog did not seem concerned about the condition of their dog.

56.    On July 6, 2022, in response to a notice left at Plaintiff Denise Venero's house to call an Officer Cooke, she telephoned Officer Cooke.

57.    He told her that Animal Control will be coming to take Plaintiffs' dogs and there was nothing they could do to stop it.

58.    At about 8:00 pm on July 6, 2022, animal control officer Deppner arrived at Plaintiff Denise Venero's home with a police officer, and another police officer joined them shortly thereafter.

59.    Plaintiff Denise Venero asked if the dogs needed to go with them and the police officer said that they did.

60.    When Plaintiff Denise Venero asked under what grounds they were taking the dogs, the animal control officer mentioned that the dogs were deemed "dangerous".

61.    On July 6, 2022, after the dogs were impounded by Defendants, animal control officer Deppner handed Plaintiff Denise Venero a Prince George's County Government, Department of the Environment, Animal Management Division Incident/Investigation Report.

62.    The Incident/Investigation Report states,

> Both dogs have been impounded for Animal Control Commission hearing/Dangerous dog
> A breed evaluation will be conducted to confirm the breeds of each dog.

63.    On July 7th, 2022, Plaintiffs Denise Venero and Stephany Venero, both called Officer Cooke and left multiple messages to inquire for more information about why Bella and Mimi were taken from their home.

64.    They also asked what steps they needed to take to get their dogs back home.

65.    Neither Plaintiffs Denise Venero nor Stephany Venero received a call back.

66.    On July 8, 2022, Plaintiff Sophia Venero called and left a message for ACO Cooke.

67.    She then contacted Animal Management Division and explained to the lady who answered her call that her family has been trying to contact Officer Cooke.

68.    The lady whom Plaintiff Sophia Venero spoke to mentioned that she will leave a message for him to call her back.

69.    Two hours passed and Officer Cooke returned her call from his personal phone (240-841-8015).

70.    Plaintiff Sophia Venero asked ACO Cooke how Bella and Mimi were doing.

71.    He said that he does not know but most likely they are fine.

72.    Plaintiff Sophia Venero informed ACO Cooke that Bella, who is a senior, has dietary restrictions and that they gave ACO Deppner her special food and proceeded to ask him why the dogs were taken.

73.    Officer Cooke explained that the dogs were taken due to an attack on the neighbor's dog and they were deemed dangerous.

74.    Plaintiff Sophia Venero asked him about what the next steps entail and he mentioned that they will be receiving a notification from his department.

75.    ACO Cooke said he was going to write the Notice of Violation that day and that it would be postmarked by Monday, July 11th, and that this Notice of Violation would state that Bella and Mimi are not going to return home.

76.    However, ACO Cooke told her that they could appeal this decision by paying $150 per dog.

77.     ACO Cooke also mentioned that once the appeal is paid and processed, this will go to the commission board and the board will provide them with a court date.

78.     ACO Cooke informed Plaintiff Sophia Venero that the dangerous dog hearing and the appeal will be a combined case.

79.     Plaintiff Sophia Venero asked him when the hearing for the appeal will take place, and ACO Cooke went on to explain that there are currently 8 dogs ahead of Bella and Mimi who are waiting for a court date, and that the dog that is next in line to receive a hearing has been there since January 2022.

80.     Plaintiff Sophia Venero asked him what was causing this delay and he mentioned that this is due to the department undergoing restructuring twice since January, and that there is a vacant position for the Director of the Animal Commission Board Member which is what is causing these hearing delays.

81.     He mentioned these hearings usually occur twice a month on Wednesdays through Zoom.

82.     The Animal Control Commission's "Hearing Dockets" on Prince George's County's website shows that the most recent hearings held by the Commission for Animal Control were last conducted on February 23, 2022.[2]

83.     As shown on the Docket Hearing website, Eugene Fernandez's dog was running at large in October of 2021.  And it was not until February 23, 2022, five months later, that a hearing was finally held.  Id.

---

[2] Available at
https://www.princegeorgescountymd.gov/AgendaCenter/ViewFile/Agenda/2144?html=true

84.     As shown in the January Hearing Docket, Charles Tran'dae's dog attacked another dog in September 2021.  The hearing was not held until three and a half months later on January 12, 2022.[3]

85.     Prince George's County Commission for Animal Control have not held any hearings since February 2022.  *See* Prince George's County website at https://www.princegeorgescountymd.gov/AgendaCenter/Animal-Control-Commission-29.

86.     Plaintiff Sophia Venero informed ACO Cooke about her knowledge of requesting a preliminary hearing and he mentioned he wasn't sure if these are being held at the moment.

87.     ACO Cooke appeared to be a bit surprised when Plaintiff Sophia Venero mentioned the topic of a preliminary hearing.

88.     ACO Cooke told her that the person who schedules these hearings, Edward Jefferson, "is out of town."

89.     Sophia asked for his contact information and email address.

90.     After the call Plaintiff Sophia Venero realized that ACO Cooke had given her the wrong telephone number for Edward Jefferson.

91.     Plaintiff Sophia Venero requested a video of the incident but ACO Cooke claimed that they needed a lawyer to contact the Chief Deputy, Terri Littlejohn, and he provided her with Terri's email address (Tylittlejohn@co.pg.md.us).

92.     Plaintiff Sophia Venero concluded the call by asking when the family can visit Bella and Mimi and he mentioned that this is only allowed and scheduled by the officer taking the case, which was, in this case, himself, and only if he deems that it is appropriate.

---

[3] https://www.princegeorgescountymd.gov/AgendaCenter/ViewFile/Agenda/_01122022-2097

93.    ACO Cooke then explained that as soon as we submit the appeal and he submits it to the commission then he can proceed with scheduling visitation hours.

94.    ACO Cooke also mentioned that due to the Parvo outbreak the shelter was currently facing, they wouldn't be able to see the dogs until after July 15th.

95.    ACO Cooke told her that the facility is in the process of a cleaning.

96.    ACO Cooke asked her the name of the person he should be addressing the Notice of Violation to.

97.    Plaintiff Sophia Venero explained that Bella and Mimi are family dogs and that she would consult with the family and would let him know of their decision.

98.    ACO Cooke provided her with his personal cell phone number and suggested that she text him with this information.

99.    After concluding the call, she tried calling Edward Jefferson to request a preliminary hearing, but the number given to her by ACO Cooke was incorrect.

100.    On Friday, July 8th, 12:45 pm, Plaintiff Sophia Venero texted ACO Cooke with the information to whom the Notice of Violation should be addressed – that being Denise Venero, her sister.

101.    Plaintiff Sophia Venero also inquired of ACO Cooke about the neighbor's dog who bit her sister, Denise, and asked him if the dog was up to date with the rabies vaccine and ACO Cooke provided Sophia with the most recent vaccination date.

102.    She also asked him for his email address so that she could send him an email with Bella and Mimi's vaccine records.

103.    On Friday, July 8th, 2:46 pm, Sophia telephone Edward Jefferson but the number that was provided by Officer Cooke was incorrect.

104.    She then texted Officer Cooke requesting another number so that she could reach Mr. Jefferson.

105.    Plaintiff Sophia Venero then immediately called Mr. Jefferson and left him a voice mail requesting a preliminary hearing.

106.    On Friday, July 8th, 11:18 pm, Plaintiffs Sophia and Denise found the "Code of Ordinances" online and educated themselves on the law as best they could.

107.    They discovered that the Animal Control Department was supposed to have sent a notice within 48 hours of the impoundment of Bella and Mimi notifying them of their right to a preliminary hearing.

108.    They also learned additionally that Defendants should have scheduled this hearing within 72 hours of them receiving the notice.

109.    On July 8, 2022 Plaintiff Sophia Venero, on behalf of herself and her sisters, sent an email to Edward Jefferson ( Citizen Service Specialist) CC Officer Cooke (jccooke@co.pg.md.us) and Terri Littlejohn (tylittlejohn@co.pg.md.us), requesting that preliminary hearing be conducted pursuant to Ordinance 3-136.

110.    Prince George's County Ordinance Section 3-136(c) mandates that once a dog is impounded under that dangerous animal ordinance, "the owner shall be notified within forty-eight (48) hours of the impound of a right to a preliminary hearing."

111.    The purpose of the preliminary hearing is,

> for the sole purpose of determining whether the owner of the animal is capable of restraining the animal from attacking, biting or injuring any human being or other animal until it can be determined at a hearing conducted by the Animal Control Commission whether the animal is dangerous.

Ordinance Section 3-136(c).

112.     No notice was ever provided to Plaintiffs, let alone within 48 hours of the impoundment,

that they had a right to a preliminary hearing.

113.     On July 11, 2022 at 9:00 AM a response was sent from Edward Jefferson, Citizen

Services Specialist, Prince George's County Government, stating,

> This message is to confirm receipt of your request for a preliminary
> hearing. I will need to confirm with Animal Services Division the
> breed of the dogs in question. Please be advised, if the dogs have
> been determined to be Pit Bulls a preliminary hearing cannot be
> granted as they are an illegal breed for the county. If they are not Pit
> Bulls, I will add your preliminary hearing to the hearings scheduled
> for the afternoon of Wednesday, July 13, 2022. The hearing is
> conducted virtually via Zoom. Once I confirm with Animal Services
> Division, I will follow up with you regarding this matter. Stay safe
> and have a great day.

114.     At 11:36 AM on the same day, July 11, 2022, Mr. Jefferson again emailed Plaintiffs

stating,

> I have received notification from Animal Services Division that the
> dogs have been determined to be Pit Bulls. As such, a preliminary
> hearing will not be granted. Your case will be scheduled for a future
> Commission for Animal Control hearing date. Stay safe and have a
> great day.

115.     Plaintiff Sophia Venero responded to the above email on July 11, 2022 at 11:48 AM,

informing him that the dogs were not Pit Bulls and provided supporting documentation showing

their breeds,

> Thank you for the quick response. Bella and Mimi are both not Pit
> bulls. They are both mixed breeds. Bella was adopted in 2014 from
> the Montgomery County Shelter. She is a lab mix. Mimi's parents
> are American bulldog/Yorkie/shiatsu. I am attaching her documents.
> Can you please provide me with a detailed explanation of the breed
> determination?
>
> I also have an animal trainer on board that is willing to assess the
> dogs and fix any behaviors in the meantime if you guys allow them
> to.

116.   Mr. Jefferson responded on July 11, 2022 at 11:57 AM stating,

> Animal Services Division are responsible for the breed evaluations.
> From my knowledge, if the dog in question has the distinguishing
> characteristics of a Pit Bull then it is deemed as such. Any evidence
> to prove otherwise should be provided to Animal Services Division
> as I have no authority in overriding their determination. I have
> copied a Supervisor to this email chain to assist in communication.

117.   Plaintiff Sophia Venero responded on July 11, 2022 at 12:57 AM,

> Thanks for the quick response. So from what I understand, the
> Animal Service Division handling the case or Officer Cooke,
> deemed my dog Pit bulls? Either way, this is a subjective and
> intangible decision. Like I said in my earlier emails, Bella (8yo) was
> adopted from Montgomery County Shelter in 2014 and she was
> registered as a Lab/ Mix Retriever(attaching her legal paperwork).
> Mimi (4yo) is a Mixed breed (looks like a Mountain Cur). This breed
> evaluation should be more extensive and not just subjective to one
> person. The police officer informed us that our dogs will be
> undergoing a DNA dog test. I am appealing this decision for both
> Bella and Mimi. I am attaching their vet paperwork along with
> Bella's Montgomery County legal documentation. I am also in the
> process of obtaining a letter from Mimi's parent's pet owners that
> certify the breed of her parents. Bella and Mimi are loving family
> dogs that deserve a fair trial and decision. I am asking for them to
> be assessed and evaluated properly. I already have contacted several
> authorities and representatives to see if they can help us with this
> matter.

118.   On July 12, 2022, given that she had not received a response to her prior email above,

Plaintiff Sophia Venero sent an email to the County (ELJefferson@co.pg.md.us,

teroberts@co.pg.md.us, jcocooke@co.pg.md.us, tylittlejohn@co.md.us ) stating "I am still

awaiting a response from the department to proceed with the preliminary hearing tomorrow as

previously discussed. We provided sufficient documentation to prove that Bella and Mimi are

not Pit bulls."

119.    On July 12, 2022 Plaintiff Sophia Venero emailed Defendants about Bella's medical

condition,

> Bella is a senior. She is eight years old and needs specific medical
> attention. Bella is being treated for recurrent Nephrolithiasis, which
> can lead to recurrent urinary tract infections. She has a special diet
> that is ABSOLUTELY ESSENTIAL which was informed to the
> Officers when she was wrongfully impounded. She needs to be
> monitored closely which entails checking her urine to make sure it
> is not too concentrated and there are no traces of blood. She must
> stay adequately hydrated and be provided with her special diet. It is
> imperative to her health and well-being that she is receiving special
> care while awaiting the preliminary hearing.

120.    That email also explained that the dogs were never supposed to be taken since the dogs

were not " at large", and that their dad had been in immediate pursuit of the dogs following their

accidental escape.  She also informed them that they still have not mailed their notice of

Violation which was supposed to be mailed within 48 hours of removing Bella and Mimi from

home.

121.    On July 13 at around 4:00 pm Plaintiff Stephany Venero called Defendant Terri

Littlejohn at 301-780-7274 as she was worried about their dogs.  Ms. Littlejohn did not answer,

so Stephany left a message on voicemail.

122.    Plaintiff Stephany Venero never received a call back form Defendant Littlejohn.

123.    On July 13, 2022, Plaintiff Sophia Venero again emailed the County stating,

> It has been 72 hours since Bella and Mimi were deemed Pit bulls
> and 23 hours since my previous email attaching all the
> documentation regarding my dog's breed. I am still waiting for a
> response.
> Since the incident (4th of July), we have not received any official
> written letter communication. Nor have we received any response/
> updates. We want to know how they are doing, especially Bella, she
> needs her special food (which was provided). We have the right to
> know how they are.

124.    On July 15, 2022 Plaintiff Sophia Venero texted ACO Cooke to check on Mimi and Bella

since he did not respond to her latest emails, and asked him about his response to the documents

that they had presented to the County for the breed evaluation.

125.    ACO Cooke texted her back telling her that he was on medical leave and that he had not

heard anything negative regarding the dogs' current conditions.  He also claimed that he had no

input in the breed determination.

126.    Plaintiff Sophia Venero then responded by text asking him who is taking over his cases

while he is on medical leave and he said that his Supervisor, Tanya Roberts (whom Sophia had

been emailing as well at teroberts@co.pg.md.us) is taking over his cases.

127.    He informed her that the breed evaluation is conducted by the shelter, and that Deputy

Chief Littlejohn has the last say.

128.    Prince George's County Ordinance 3-185.01 titled "Pit Bull Terriers" states,

> (a)     Except as provided below, no person shall own, keep, or harbor a Pit Bull Terrier within the County.
>
> (b)     Any person owning a Pit Bull Terrier prior to November 1, 1996, may continue to harbor the animal on his premises under the following conditions * * *

129.    The definition of a "pit bull" is set forth in Ordinance 3-101, and is as follows,

> Pit Bull Terrier shall mean any and all of the following dogs:
>
> (A) Staffordshire Bull Terrier breed of dogs;
> (B) American Staffordshire Terrier breed of dogs;
> (C) American Pit Bull Terrier breed of dogs;
> (D) Dogs which have the appearance of being predominantly of the breed of dogs known as Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier. Predominantly shall mean that the dog exhibits the physical characteristics of a Pit Bull Terrier more than any other breed of dog;
> (E)   Dogs which have been registered at any time as a Pit Bull Terrier.

130.   Plaintiff Sophia Venero further inquired about visitation hours and ACO Cooke said that the "visitation hours are not allowed and it is under the discretion of the officer who is in charge of the case".

131.   She asked him if there is a timeframe in which this can be scheduled and he claimed that he will contact her upon his return.

132.   On Friday, July 15th, 2022 between 4:14 PM and 4:18 PM, Plaintiff Sophia Venero called Tanya Roberts at 301-780-7230 and left her a Voicemail.  She also called Terri Littlejohn, Chief Deputy, and left her a Voicemail at 301-780-7274.

133.   She never heard from either of them.

134.   On July 15, 2022, Plaintiff Denise Venero received a Notice of Violation from the Prince George's County Government, Department of Environment, Animal Services Division Deputy Associate Director, T. Littlejohn. (Exhibit A).

135.   Although this Notice of Violation was dated July 11, 2022 it was not postmarked until July 12, 2022.

136.   On July 19, 2022 this Notice of Violation also arrived via certified mail.

137.   The Notice of Violation alleges Plaintiffs' two dogs attacked another dog and "caused severe injury."

138.   According to the Notice of Violation dated July 11, 2022, an "order was put out to impound the animals pending a vicious dog hearing.

139.   The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance Section 3-131(c),

> "Section 3-131(c) 'Manner of keeping animals – No person shall keep or maintain any animal in Prince George's County in such manner as to cause or permit animal to be a public nuisance.'"

140.    Prince George's County Ordinance Section 3-131(c) titled "Manner of keeping animals; prohibition of nuisances" states,

> No person shall keep or maintain any animal in Prince George's County in such manner as to cause or permit the animal to be a public nuisance or to cause or permit the animal to cause a public nuisance condition. No person shall keep or maintain any animal in the County in such manner as to disturb the peace, comfort, or health of any person residing within the County.

141.    The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance "Section 3-135 –'Animals at Large Prohibited.'"

142.    Prince George's County Ordinance Section 3-135 titled "Animals at Large Prohibited" states at part (a),

> It shall be unlawful for the owner or custodian of any animal (including, but not limited to, any cattle, horse, mule, swine, sheep, goat, geese, ducks, chickens, dog, cat, or other animal) to permit the animal to run at large or be at large as defined in Section 3-101(7) within Prince George's County, Maryland.

143.    Section 3-135(e) authorizes an Animal Control Officer to impound the animal, and failure to surrender the animal immediately to the ACO is a misdemeanor.

144.    Section 3-135(g) states, "No animal running at large by accident with a person in immediate pursuit of it shall be deemed to be at large, running at large or a stray."

145.    The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance "Section 3-136 – 'Dangerous Animals'"

146.    Section 3-136 is titled "Dangerous Animals", and section (a) of this Ordinance does not include in the definition of a dangerous animal a dog that injures another dog,

> Any animal that without provocation (i) inflicts injury on a human on private or public property; (ii) kills a domesticated and/or farm animal; or (iii) has been previously found to be potentially dangerous because of injury inflicted on a human or an animal, the owner having received notice of such and the animal again

aggressively bites, attacks, or endangers public safety is defined to be a dangerous animal for the purpose of this Subtitle.

147.    According to Section (b) of the dangerous animal ordinance, Section 3-136,

It shall be the duty of the Police Department to receive and document complaints concerning dangerous animals. It shall be the duty of the Administrator/Animal Control Officer to receive and investigate complaints concerning dangerous animals.

148.    According to Section3-136(b) of the of the dangerous animal ordinance, an animal control officer can impound a dog pending a hearing, if the ACO reasonably believes the owner of the animal is not capable of restraining the animal from attacking a human or another animal,

Whenever an animal complained against shall be reasonably deemed by a police officer or the Administrator/Animal Control Officer to be a dangerous animal, the police officer or Administrator/Animal Control Officer shall report the fact to the Commission in the form of a written complaint and shall be authorized and empowered to impound the animal pending a hearing if he reasonably believes that the owner of the animal is not capable of restraining the animal from attacking, biting, or injuring any human being or other animal pending a hearing on whether the animal is dangerous.

149.    According to Section (b) of the of the dangerous animal ordinance, Section 3-136, "Notwithstanding the above, whenever an animal causes severe injury to any human being, the police officer or Animal Control Officer shall impound the animal pending a hearing by the Commission."

150.    According to Section 3-136(c),

The preliminary hearing shall be scheduled within seventy-two (72) hours of a written request by the owner. This preliminary hearing may be conducted by a hearing officer designated by the Commission and shall be for the sole purpose of determining whether the owner of the animal is capable of restraining the animal from attacking, biting or injuring any human being or other animal until it can be determined at a hearing conducted by the Animal Control Commission whether the animal is dangerous.

151.   According to Section 3-136(d),

> If it is determined that the alleged dangerous animal may be returned to the custody of the owner until the scheduled full hearing, the Commission may impose such requirements of conditions as are deemed necessary to restrain the animal and the owner shall be required to pay the costs and maintenance expenses incurred during the time that the animal was impounded. Should the owner not adhere to conditions set forth by the Commission, the alleged dangerous animal shall be immediately impounded and remain in the custody of the County pending the outcome of the full hearing.

152.   Section 3-136(e), states, "If the Commission determines that continuing impoundment is necessary, the owner shall be responsible for all costs and maintenance expenses incurred."

153.   The Animal Control Commission " shall conduct a public hearing upon the question of whether the animal is a dangerous animal in accordance with the provisions of Section 3-110 of this Subtitle." *See* Section 3-136(g).

154.   Section 3-110 sets forth the "hearing procedures" for a dangerous dog hearing.

155.   According to Section 3-110(e),

> The Commission shall give notice in writing by regular mail to the complainant, the person charged or the appellant of a violation notice or citation, of the time and place of a public hearing. The Commission shall also send notice by personal delivery, or by certified mail, return receipt requested, to the person charged.

156.   According to Section 3-110(i),

> At the close of all the evidence, the Commission shall deliberate and shall issue written findings of fact, conclusions, and an appropriate order. If the Commission finds that a violation did not occur, it shall dismiss the complaint or citation. If the Commission finds that a violation has occurred, or that an animal is a public nuisance animal, or that a public nuisance condition exists, it may impose civil penalties pursuant to Section 3-116. In lieu of or in addition to imposing civil penalties, it may require appropriate affirmative action, including but not limited to:
> (1) The mandatory restriction or confinement of the animal under such conditions as the Commission may direct in its discretion;

25

> (2) The mandatory destruction or other disposition of the animal as the Commission may direct in its discretion;
> (3) The correction of conditions or methods of animal care, keeping, maintenance, housing, or veterinary treatment as the Commission may direct in its discretion to include spaying and neutering;
> (4) A recommendation to the Director that licenses issued under this Subtitle be suspended or revoked;
> (5) A restriction of animal ownership for a period up to five (5) years from the date of determination subject to the right to petition the Board for a waiver based on good cause shown;
> (6) A recommendation to the State's Attorney for criminal prosecution of violations of this Subtitle or of other laws.

157.    Section 3-111 provides for an appeal from the Commission's order regarding a dog as dangerous,

> Any party, including Prince George's County, Maryland, aggrieved by a final order of the Commission in a contested case, whether such decision is affirmative or negative in form, is entitled to appeal that order to the Circuit Court for Prince George's County, within fifteen (15) business days of the date of the order. Such appeal shall be governed by the provisions of the Maryland Rules pertaining to administrative appeals. The decision of the Circuit Court in all appeals from decisions of the Commission shall be final.

158.    According to Section 3-136(h)

> If the Commission, upon the evidence before it, finds that the animal complained of is in fact a dangerous animal, as defined in Subsection (a), above, and Section 3-101(32), the Commission may direct the owner or custodian of the dangerous animal to confine the animal and to abate its danger to the public in accordance with Section 3-137 herein, or require the owner or custodian of the dangerous animal to surrender the animal to the County and authorize the Administrator to destroy the animal.

159.    The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance "Section 3-142 'Irresponsible Pet Owner'"

160.    Section 3-142(a) provides,

> An owner or custodian shall be declared to be an irresponsible owner if:

(1)  they allow their animal to inflict bites on a human or another domesticated animal either on public or private property;

(2)  they allow their animal to chase or approach a person in a menacing fashion or apparent attitude of attack, or with a known propensity, tendency, or disposition to attack unprovoked, to cause injury, or otherwise to threaten the safety of humans or animals;

(3)  they fail to provide proper care and treatment for an animal;

(4)  they fail to provide humane training for appropriate temperament and response;

(5)  they fail to take precautions to abate aggressive behavior; prevent an imminent threat, assault or disturbance; or ensure surrounding circumstances and environment do not create or give rise to potentially dangerous situations.

161.  The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance "Section 3-182 'Potentially Dangerous Animals.'"

162.  Section 3-182 (a) states,

The owner of a dog identified as potentially dangerous shall establish to the satisfaction of the Administrator that:
(1) The owner of the potentially dangerous dog is 18 years of age or older;
(2) A valid pet license has been issued for the potentially dangerous dog;
(3) The potentially dangerous dog has current vaccinations;
(4) The owner has a proper enclosure, as determined by the Administrator, to confine the potentially dangerous dog;
(5) The potentially dangerous dog has been spayed or neutered;
(6) The potentially dangerous dog has been implanted with a microchip containing owner identification information; and
(7) The owner has written permission of the property owner, if the dog owner is not the property owner, and from a homeowner's association, if appropriate, to house the dog on the premises where the dog will be kept.

163.  Section 3-182 (b) states,

(b) Failure to establish the above criteria to the satisfaction of the Administrator, shall result in immediate impoundment, if the subject animal is not already in the possession of the County. If the dog is impounded, the owner may appeal the Administrator's decision regarding any of their recommendations within ten days of receiving

notice if they do not agree. They may file a written petition with the
Commission for Animal Control for return of the animal.

164.   The Notice of Violation states,

After thoroughly reviewing your case, the following decision has
been made regarding your case.

**We do NOT intend to return these animals to you.**

(Emphasis in original)

165.   The Notice of Violation advises that if Plaintiffs wish to appeal this decision to not return
the dogs to them, they "must post a non-refundable appeal bond in the amount of "**$150.00 PER
DOG** [ ] in accordance with Section 3-106, item (e) of the Prince George's County Animal
Control Ordinance."

166.   The bond must be paid to Animal Services Division at 3750 Brown Station Rd, Upper
Marlboro, Maryland 20772 no later than no later than 4:00 P.M. Friday July 22, 2022.

167.   The request for an appeal must be in writing, and must contain a copy of the bond receipt,
and must be received by The Commission for Animal Control, 1801 McCormick Drive Suite
500, Largo, Maryland 20774, no later than 4:00 P.M. July 22, 2022.

168.   If an appeal is not requested "the animal will become the property of Prince George's
County."

169.    Additionally, this bond, according to the Ordinance, may be required to be paid every
thirty days, despite a hearing not being provided until six months or more after the seizure of
the animals.  *See* Ordinance Section (e)(1) of 3-106(e)(1).

170.   Section 3-106 is titled "Fees for boarding and care of animals; security."

171.   Section (e)(1) of 3-106 states,

A person claiming a proprietary interest in any animal confined
pursuant to Sections 3-122, 3-123, 3-131 through 3-138, 3-140, 3-
141, 3-175, 3-176, 3-180, or Division 7 of this Subtitle may

prevent disposition of the animal after the required holding period, pending a Commission for Animal Control hearing, by posting a bond, cash or corporate surety, with the Administrator prior to the expiration of the required holding period in an amount sufficient to secure payment for all reasonable expenses incurred in caring and providing for the animal, including estimated medical care, for at least thirty (30) days; provided, however, that such bond, cash or corporate surety, shall not prevent the Administrator from disposing of such animal at the end of the thirty (30) day period covered by the bond, cash or corporate surety, unless the person claiming an interest posts an additional bond, cash or corporate surety, with the Administrator to secure payment of reasonable expenses for an additional thirty (30) days, and does so prior to the expiration of the first 30-day period.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations
### Vagueness
### ("Pit Bull" Ordinance)

172.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

173.    Defendants' enforcement of Ordinance 3-185.01 describes prohibited animals by reference to breed standards written for use by breed aficionados and thus deprives Plaintiffs of fair warning of prohibited conduct and is unconstitutionally vague and violates the Fourteenth Amendment.

174.    Defendants' enforcement of an ordinance that bans ownership of any dog that possesses a "majority of the physical traits" of a prohibited animal deprives Plaintiffs of fair warning of prohibited conduct and is unconstitutionally vague.

175.    Defendants' failure to publicize the County's methodologies for determining whether a particular dog possesses "a majority of the physical traits" of a prohibited animal deprives Plaintiffs of fair warning of prohibited conduct and is unconstitutionally vague.

176.    Ordinance 3-101 states a dog that a "pit bull" is a dog that has the appearance of being predominantly of the breed of dogs known as Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier.  However, a "pit bull", like all dogs, has four legs, paws, a tail, barks, and fur.  The Ordinance does not in any way give guidance as to what specific criteria must be used to determine what is a pit bull, other than naming three breeds.[4]  Thus the determination that a dog is a "pit bull", unless the person making the decision knows the dog is a pure bred of the three breeds, is solely his opinion, bias, and prejudice, and thus is wholly arbitrary and capricious, and constitutes law by cop.

177.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation-Substantive Due Process**

178.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

179.    Defendants' policy of forcing Plaintiffs to surrender their companion animals to the County where there is no evidence that the animals posed a threat to public safety, violates Plaintiffs' liberty and property interests protected under the Fourteenth Amendment.

---

[4] While there is no question that as to pure bred dogs of the four listed breeds, the Ordinance is clear, there is no way, absent DNA tests to determine what other dogs may fit into the description, and at what point having blood from any of these four listed breeds, in their ancestry would subject them to this Ordinance.  Even the Nazis during WWII in their racial purity laws defined a point at which a person was considered jewish enough to be subject to their restrictive laws and extermination.

180.     Defendants' practice of impounding, retaining, and destroying Plaintiffs' property, where there is no evidence that the property posed a public nuisance or otherwise threatened public safety, violates Plaintiffs' property interests protected under the Fourteenth Amendment.

181.     As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation-Procedural Due Process
### (Facial and As Applied Challenge)

182.     Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

183.     Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by him.

184.     The lack of affording animal owners with a prompt post-seizure hearing is a facially unconstitutional policy.

185.     The lack of affording dog owners of a manner and means by which to contest the designation of their dogs as "pit bulls" is a facially unconstitutional policy.

186.     The impounding of animals by Defendants lacks any rules, standards, policies, procedures or regulations.

187.     The designation by Defendants of dogs as "pit bulls", and the manner in which to challenge the designation lacks any rules, standards, formal policies, or regulations.

188.    The process employed by Defendants fails to inform a person of reasonable intelligence as to how to challenge the impoundment of the seized animals and the Defendants' determination that the dog is a "pit bull".

189.    There are no rules nor uniform standards for how a dog is designated as a "pit bull."

190.    Defendants proceed upon impoundment according to their own whims with no oversight or guidance of any sort, causing the retention and holding of dogs, by definition, to be arbitrary and capricious, and violative of both the due process clause and equal protection clause of the US Constitution.

191.    Having no specific statutory authority to do so, Defendants have held and retained, and continue to retain, Plaintiffs' dogs, during which time they have not provided Plaintiffs any evidence or basis for making the designation, nor an opportunity to contest the designation of Plaintiff's dogs as "pit bulls", and the retention of Plaintiffs' dogs based upon that designation, thus violating Plaintiffs' rights under the 14th Amendment to the US Constitution.

192.    Defendants' unwritten policy and practice of summarily retaining dogs whom Defendants claim are pit bulls is not authorized by the ordinance and violates Plaintiffs' right to due process.

193.    Defendants actions are unconstitutional because there are no rules, policies, procedures, guidelines, practices or regulations regarding its impoundment of dogs, and designation of dogs as "pit bulls."

194.    Defendants' actions are unconstitutional because the named Plaintiffs, whose dogs have been seized and retained, have never been afforded an opportunity to be heard at a meaningful time and in a meaningful manner at which to contest the validity of the seizure of their dogs and the dogs' continued retention.

195.    Defendants' actions are unconstitutional because the named Plaintiffs, whose dogs have been designated as "pit bulls", have never been afforded an opportunity to be heard at a meaningful time and in a meaningful manner at which to contest this designation.

196.    Defendants' actions are unconstitutional because Plaintiffs have also been deprived of visitation with their dogs, and of providing their choice of care, food, medical attention, exercise and other indicia of ownership to their dogs.

197.    Defendants' actions have prevented and failed to provide Plaintiffs with timely notice and an opportunity for a hearing or any other review of the decision to seize and retain, such that Plaintiffs' deprivation of their property, their dogs, without process, has occurred and continues to occur, thus violating Plaintiffs' rights under the 14th Amendment.

198.    Defendants' actions have prevented and failed to provide Plaintiffs with timely notice and an opportunity for a hearing or any other review of the decision to designate their dogs as "pit bulls", such that Plaintiffs' deprivation of their property, their dogs, without process, has occurred and continues to occur, thus violating Plaintiffs' rights under the 14th Amendment.

199.    Defendants have failed to provide Plaintiffs with a prompt and timely post-seizure hearing before a neutral judicial or administrative officer to determine whether defendants (i) absent specific statutory authority to seize and retain, are authorized, without providing notice, an opportunity to be heard or any other process, to seize and retain Plaintiffs' dogs, and under what circumstances they may do so; (ii) absent specific statutory authority to designate dogs as "pit bulls", are authorized, without providing notice, an opportunity to be heard or any other process, to seize and retain Plaintiffs' dogs, and authorized to designate dogs as "pit bulls" and under what circumstances they may do so; (ii) had probable cause to effectuate the warrantless seizures of their dogs under the 4th Amendment to the US Constitution; and (iii) had properly

determined whether means short of detention of their dogs could satisfy the County's need for continued impoundment and detention of their dogs.

200.    As a result, Plaintiffs suffered, and will continue to suffer into the future, harm as a result of the total lack of any rules, regulations, guidelines, practices or procedures regarding the impoundment of animals and designation of dogs as "pit bull."

201.    Plaintiffs will continue to be deprived of their constitutional rights indefinitely until there are clear and known procedures in place to protect from deprivations of property and violations of constitutional rights as a result of the impoundment of animals by Defendants.

202.    Defendants' actions have resulted in a meaningful interference and deprivation of Plaintiffs' property, their dogs, without any process and is violative of the procedural due process requirements of the 14th Amendment to the US Constitution.

203.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries

204.    Plaintiffs therefore urge that the appropriate remedy is for this Court to order Defendants to immediately return the dogs to Plaintiff Denise Venero and enjoin Defendants from impounding dogs and from designating dogs as "pit bulls", until the Commissioner promulgates such rules, regulations, guidelines, practices or procedures that would pass constitutional muster in the situations presented in this Complaint.


# FOURTH CAUSE OF ACTION
## 42 U.S.C. § 1983
## Fourteenth Amendment Violation - Equal Protection

205.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

206.     Ordinarily, "[t]o state a claim for an equal protection violation, [plaintiffs] must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999), *overruled in part on other grounds by Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002).

207.     However, "an individual not alleging invidious discrimination on the basis of membership in some group may nevertheless prevail on an equal protection claim under the 'class of one' theory recognized by the Supreme Court in *Willowbrook v. Olech*," *Young*, 2010 U.S. Dist. LEXIS 35368, 2010 WL 1424008, at *16 (*citing Willowbrook,* 528 U.S. 562 [2000])

208.     "Under a 'class of one' equal protection claim, a plaintiff must allege that (1) '[she] has been intentionally treated differently from others similarly situated' and (2) 'there is no rational basis for the difference in treatment.'" *Id*. (quoting *Willowbrook*, 528 U.S. at 564). "In order to state an equal protection violation under § 1983, 'it is axiomatic that plaintiff must allege that similarly situated persons were treated differently.'" *Id*. (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 [2d Cir. 1994]).

209.     "To prove a 'class of one' claim, the plaintiff must show (1) that he was treated differently from other similarly situated individuals, and  (2) that the defendant unequally applied a facially neutral ordinance for the purpose of discriminating against him." *Leib v. Hillsborough Cty. Public Transp. Com'n*, 558 F.3d 1301, 1307 (11th Cir. 2009)

210.     To be similarly situated, "the comparators must be prima facie identical in all relevant respects." *Grider v. City of Auburn, Ala*., 618 F.3d 1240, 1264 (11th Cir. 2010) (internal quotation marks omitted); *Roma Outdoor Creations, Inc. v. City of Cumming, Ga*., 599 F. Supp. 2d 1332, 1343 (N.D. Ga. 2009) ("a class of one plaintiff must demonstrate an extremely high level of similarity between the plaintiff and the allegedly similarly situated comparator").

211.    "Under Olech, a 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: (1) negate every conceivable basis which might support the government action; or (2) demonstrate that the challenged government action was motivated by animus or ill-will." *Dibbs v. Hillsborough Cty., Fla.*, 67 F. Supp. 3d 1340, 1349 (M.D. Fla. 2014) (internal alteration and quotations omitted).

212.    Defendants have treated the class members differently.

213.    Everyone other than the class members, are entitled to an impoundment hearing.

214.    Based upon a determination not supported by the facts, Defendants have denied them rights provided by law.

215.    In the absence of declaratory and injunctive relief, Plaintiffs will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution.

216.    Plaintiffs are entitled compensatory and consequential damages in an amount to be determined by a jury after trial, plus attorney fees, costs, disbursements, and other incidental and consequential damages, plus interest.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Fourth Amendment Violation

217.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

218.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by him.

36

219.     Defendants unlawfully and unconstitutionally seized Plaintiffs' personalty, to wit, Bella and Mimi, in violation of the Fourth Amendment to the United States Constitution.

220.     Dogs are property and for 4th Amendment purposes, dogs are considered effects and therefore entitled to protection.

221.     A seizure of Plaintiffs' dogs occurred and upon Defendants taking possession of the dogs, they were never told they would not get their dogs back, and were prevented from obtaining any due process to challenge the impoundment and continued retention of the dogs.

222.     A continued retention of Plaintiffs' property, their dog, after the 48 hour and 72 hour notice time lapsed a warrantless seizure.

223.     Plaintiffs have been deprived of visitation with their dogs, and of being able to provide their choice of care, food, medical attention, exercise and other indicia of ownership to their dogs.

224.     The seizure of Plaintiffs' dogs is unreasonable because there exists no explicit statutory authority to hold the dog when Defendants failed to provide an opportunity for an impoundment hearing and a post-seizure hearing.

225.     The seizure of Plaintiffs' dogs is unreasonable because there exists no explicit statutory authority to hold the dog Defendants have determined to be "pit bulls".

226.     The seizure is unreasonable because there are no rules, guidelines, procedures, policies, regulations or uniform standards concerning when it is permissible to retain plaintiffs' dogs.

227.     The seizure is unreasonable because the persons who made the determination that Plaintiffs' dogs are "pit bulls" have no required specific training or specialized knowledge to enable them to make a determination to detain the dog.

228.    The retention of the dogs is unreasonable because there is no ability to contest it, and in fact Plaintiffs were actively prevented from obtaining a hearing either on the designation of the dogs as dangerous and on the continued retention of their dogs.

229.    The seizure is unreasonable because there is no uniform method of assessing whether a dog is a "pit bull" or not, and therefore no standardized process, rules, procedures or policies exist to make a determination to detain the dog indefinitely.

230.    The seizure is unreasonable because the length of the seizure and retention is not brief or for a predetermined length of time, and lasts for a minimum of 6-8 months and possibly permanently.  It is expected that most class members were permanently deprived of their dogs in the early stages after the seizure, as a result of the scheme perpetrated by Defendants.

231.    The seizure is unreasonable because of the absence of any rules, guidelines, procedures, policies, regulations or uniform standards to limit the unfettered discretion of the individual defendants, and the lack of any review process or means to challenge the propriety of the seizure and retention of Plaintiffs' dogs.

232.    By seizing Plaintiffs' dogs and retaining possession of such dogs indefinitely, and without providing Plaintiffs with the necessary due process, including an opportunity to contest the validity of the seizure and retention, Defendants violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution.

233.    Defendants' impoundment and retention scheme is unconstitutional because it permits seizures and impoundments of property, while at the same time vesting ultimate discretion and authority in the Defendants to seize Plaintiffs' property, with no rules or procedures that must be followed.

234.    Although the named Plaintiffs were told they could Appeal the decision to not return their dogs, a bond must be paid before being allowed to appeal a decision that Plaintiffs have

not been provided any basis for or justification, without having been given any process, as required by the Ordinance, and without the ability to adequately refute the evidence purportedly forming the basis of the decision.  No reasons were given for the decision not to return the dogs. There are no procedures as to who makes the decision to not return the dogs, there is no statute which provides any information on who makes that decision, and based upon what evidence. Nor were the Plaintiffs allowed to see the purported evidence or refute it.  Moreover, the appeal would be an exercise in futility as the Commission has not held a hearing since February 22, 2022 and the holding of Plaintiffs' dogs is a permanent deprivation and constitutes  an unreasonable seizure.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Monell

235.   Defendants have violated Plaintiffs' constitutional rights based on policy and custom as stated above, and defective training, pursuant to the doctrines set forth in *Monell v Dept. of Soc. Serv.,* 436 U.S. 658 (1978) and progeny, as the moving force behind the constitutional injuries stated in the preceding causes of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.      Accept jurisdiction over this action;

B.      For Declaratory Judgment (28 U.S.C. §§ 2201-2202, 42 U.S.C. § 1983) as follows,

      a.   finding that 3-185.01 titled "Pit Bull Terriers " unconstitutional facially and as applied under the Fourth and Fourteenth Amendments to the United States Constitution (seizure, procedural due process deprivation of liberty and property;

substantive due process deprivation; vagueness; overbreadth; underbreadth; equal

protection), with respect to both mixed-breed and purebred dogs;

b.   finding County Ordinance 3-185.01 unconstitutional under the Fourteenth

Amendment for failing to provide any opportunity to be heard upon a unilateral,

permanent designation of a dog as a "Pit Bull".

c.   Finding the actions of Defendants unconstitutional under the Fourth and

Fourteenth Amendment for failing to provide a prompt post-seizure hearing.

d.   Finding the actions of Defendants in failing to provide notice and an

impoundment hearing as required by Ordinance 3-136 to be unconstitutional.

C.      Prospective injunctive relief under 28 U.S.C. §§ 2201-2202, 42 U.S.C. § 1983 as

follows,

a.   Plaintiffs seek to enjoin the County from enforcing and enacting breed-specific

prohibitions, for violating the Fourth and Fourteenth Amendments of the United

States Constitution as stated below, and to mandate that the County provide a

meaningful opportunity to contest the unilateral, permanent determination that a

dog is a "Pit Bull."

b.   Plaintiffs seek to enjoin Defendants from detaining animals until they provide

the notice and a hearing as required by Ordinance 3-136.

D.      Order Defendants to release to their owners those dogs seized and held for disposal,

unless an impoundment hearing and a post-seizure hearing is promptly held;

E.      Issue a temporary restraining order, and preliminary and permanent injunction, barring

the Defendant class from retaining possession of dogs unless and until they provide a prompt

post seizure pre-judgment hearing before a neutral judicial or administrative officer.

F.      Enjoin Defendants from harming, selling, transferring, alienating, or otherwise killing the dogs;

G.      Based upon the failure to give an impoundment hearing pursuant to Prince George's County Ordinance Section 3-136, along with the dangerous conditions of the parvo outbreak, Order Defendants to immediately return the dogs, or in the alternative within 72 hours give a hearing as required by statute on whether Plaintiffs are able to restrain the dogs.[5]  The hearing must be, as mandated by the Ordinance, a hearing solely on issue of whether plaintiff's are able to restrain the dog, and if they are able to restrain the dogs they are to be returned as provided by statute;

H.      Stay the obligation to file a notice of appeal and/or post a bond.[6]

I.      Certify this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1)(A) and 23(b)(2);

J.      For economic damages, representing the intrinsic value and loss of use of Bella and Mimi, subject to proof and modification at trial;

K.      For special and general damages relating to the deprivation of Plaintiffs' property – Bella and Mimi;

L.      For noneconomic damages, including emotional distress and loss of enjoyment of life, subject to proof and modification at trial;`

M.      For veterinary expenses which may be needed for Bella and Mimi;

N.      For future medical expenses pertaining to Plaintiffs' treatment for emotional distress;

---

[5] There are no clear standards such as who has the burden of proof, what is the quantum of proof, who bears the burden of persuasion and what rules appley.

[6] Obviously if dogs are released immediately, or a hearing is held and dogs are ordered to be released, then there is no need to appeal or post bond.

O.       For punitive damages against Defendants;

P.       For reasonable attorney's fees and other litigation-related costs as allowed by law under

42 U.S.C. § 1988, or, in the alternative, statutory attorney's fees;

Q.       For costs of suit;

R.       For postjudgment interest at the highest rate permitted by law;

S.       For such other and further relief as the Court may deem just and proper.


**JURY DEMAND:  PLAINTIFFS REQUEST A JURY TRIAL ON ALL MATTERS SO TRIABLE**

Dated: July 22, 2022


/s/ Richard Rosenthal
RICHARD BRUCE ROSENTHAL
(NY Reg. No. 1637677)
545 E. Jericho Turnpike
Huntington Station, New York 11746
Phone: 718-261-0200
Fax: 718-793-2791
Email: richard@thedoglawyer.com
*Attorney for Plaintiff*

/s/ Rebekah Lusk
Rebekah D. Lusk, Esq.
(Md Bar No. Bar 29353)
LUSK LAW, LLC
113 E. Church St.
Frederick, MD 21701
Phone: 443-535-9715
Email: rlusk@lusk-law.com
*Attorney for Plaintiffs*

## VERIFICATION OF COMPLAINT
### PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing Complaint is true and accurate to the best of my knowledge.

Executed on July 20, 2022

Denise Venero

Scanned with CamScanner

## VERIFICATION OF COMPLAINT
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing Complaint is true and accurate to the

best of my knowledge.

Executed on July 20, 2022

Sophia Venero

Edward Azar
Notary Public of New Jersey
My Commission Expires April 28, 2025

**VERIFICATION OF COMPLAINT**
**PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing Complaint is true and accurate to the best of my knowledge.

Executed on July 20, 2022

Stephany Venero

Scanned with CamScanner