**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| DENISE VENERO, SOPHIA VENERO, STEPHANY VENERO, Individually and on behalf of all persons similarly situated, John and Jane Does (1-1000)  Plaintiffs,  v.  PRINCE GEORGE'S COUNTY, MARYLAND, EDWARD L. JEFFERSON, in his official and individual capacity, TERRI LITTLEJOHN, in her official and individual capacity, TANYA ROBERTS, in her official and individual capacity, JACOB C. COOKE, in his official and individual capacity, DOES 1-10, in their official and individual capacities.  Defendants. | CASE NO.: 8:22-cv-01805-GLS  **FIRST AMENDED CLASS ACTION VERIFIED COMPLAINT**  **[JURY DEMAND ENDORSED HEREON]** |

It has been said that,

*"[i]ndividual freedom finds tangible expression in property rights."[1]*

The Defendants, individually and working in concert, have disregarded this venerable principle by seizing, keeping, and on occasion killing the private property of others (in this case dogs, cats and turtles) without providing the constitutionally required hearings. This they cannot do.

COMES NOW, Plaintiffs, Denise Venero, Sophia Venero, and Stephany Venero, on their

own behalf and on behalf of all other persons set forth in the Class allegations, in the above-titled

---

[1] *United States v. James Daniel Good Real Property*, 510 U.S. 43, 61 {1993}.

action, hereby file their Class Action Verified Complaint against Defendants Prince George's

County, Edward L. Jefferson, Terri Littlejohn, Tanya Roberts, and Jacob C. Cooke, and Does 1-

10, and respectfully allege as follows,

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States including Article

III, Section 1 of the United States Constitution and 42 U.S.C. § 1983, and Section 3604 of the

FHA.  (42 U.S.C. § 3601, et seq.)

2.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331, because this lawsuit is

brought under the Fair Housing Act, 42 U.S.C. § 3601, et seq.

4.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, § 1343(a)(3), §

1343(a)(4) and § 1367(a), regarding the principles of pendent and supplemental jurisdiction over

related state law claims.

5.      This Court has authority to grant the declaratory relief requested herein pursuant to 28

U.S.C. § 2201(a).

6.      Jurisdiction supporting Plaintiffs' claims for attorneys fees is conferred by 42 U.S.C. §

1988.

7.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391.

## PARTIES

8.      Plaintiff Denise Venero is an individual and a resident of the State of Maryland.  Ms.

Venero co-owns two dogs named Bella and Mimi, with her sisters Sophia Venero and Stephany

Venero.

9.      Plaintiff Sophia Venero is an individual and resident of the State of New Jersey, and she co-owns two dogs named Bella and Mimi, with her sisters Plaintiffs Denise Venero and Stephany Venero.

10.     Plaintiff Stephany Venero is an individual and resident of the State of Maryland.  Ms. Venero co-owns two dogs named Bella and Mimi, with her sisters Sophia Venero and Denise Venero.  Stephany Venero owns the house that Defendants' seized Plaintiffs' dogs from.

11.     Defendant Prince George's County, Maryland (the "County") is a municipal corporation formed under the laws of Maryland. The County is sued for declaratory, injunctive, and monetary relief.

12.     Defendant Edward L. Jefferson is a Citizens Services Specialist for and employed by Defendant Prince George's County.

13.     Defendant Terri Littlejohn is the Assistant Associate Director of Prince George's County Animal Services Facility and oversees the Animal Services Facility.  Defendant Littlejohn supervises Defendant Roberts.

14.     Defendant Jacob C. Cooke is an animal control officer for Defendant Prince George's County.

15.     Defendant Tanya Roberts is an animal control officer and is the Animal Control Officer Supervisor at Prince George's County, Maryland. Defendant Roberts supervises Defendant Cooke.

## CLASS ALLEGATIONS

### CLASS

16.     *Class*: The named plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), on their behalf and on behalf of all other persons similarly situated ("Plaintiff Class").

The named plaintiffs are representative parties of a number of classes of individuals consisting of,

> (1) all dog owners whose dogs have been, or will in the future be, seized and impounded, without any process, by the Defendant Prince George's County and subjected to conditions inconsistent with the minimum standards required by Maryland law, and thus constituting a criminal act against plaintiffs' property;

> (2) all dog owners whose dogs have not been scientifically classified as being part of the three breeds set forth in the "Pit Bull" Ordinance, but that have been deemed "Pit Bulls" based upon purely subjective criteria, such as appearance;

> (3) All dogs are currently or have been subjected to the forced internment in the Prince George's County Animal Facility by Defendants;

> (4) persons whose animals were seized and impounded by Defendants and not provided notice of the right to an impoundment hearing, and/or have not provided an impoundment hearing;

> (5) persons whose animals were seized and impounded by Defendants and not provided a prompt post-seizure *Matthews* hearing; and

> (7) persons whose dogs were seized and impounded based upon being designated as a "pit bull"; and

> (8) minority persons who have had their dogs seized based upon being a "Pit Bull".

> (9) All dogs that are Emotional Support Animals that Defendants have impounded, or may impounded – based upon suspicion of looking like a "Pit Bull". .

17.     The named plaintiffs also bring this action on behalf of a sub-class within the Plaintiffs' above classes, consisting of all such persons who timely refused to agree to the execution of their

dog, or will in the future refuse to agree to the execution order issued by Prince George's County, and whose dogs are (or will be) impounded and held pending resolution of the administrative/legal process.

18.     Furthermore, the Plaintiff Class is comprised of members, at a minimum, spread out across the County of Prince George, and may include visitors to Prince George's County, who own dogs who have been seized and held by Defendants.

19.     There are common questions of law and fact affecting the class represented by the Plaintiffs regarding the retention of animals and the procedures the city employs in releasing animals from Animal Control.

20.     *Numerosity* — Joinder of all members of the Plaintiff Class is impracticable because the class is so numerous both as to those whose dogs were previously so impounded, and, as to those who will hereafter become so aggrieved.. *See* Fed. R. Civ. P. 23(a)(1).  The exact size of the Plaintiff Class is currently unknown however Defendant Cooke has informed Plaintiff Sophia Venero that there are eight additional dogs held on dangerous dog charges who have owners that still have not received due process, and whose dogs are being kept from them by Defendants.  These eight dogs does not include the number of dog owners from the prior years that have not been given due process and the additional dogs that will be illegally impounded in the future without due process.  The Plaintiff Class is therefore sufficiently numerous to make joinder impractical. *See Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990) (holding that a court "may certify a class even if it is composed of as few as 14 members.").  As to the dogs alleged to be pit bulls, we know that approximately 400 "Pit Bulls" were killed in the year 2018.[2]  We know upon information and belief that there are hundreds of pit bulls in the Animal

---

[2] See https://www.washingtonpost.com/local/md-politics/about-400-pit-bulls-euthanized-last-year-in-prince-georges-officials-say/2019/10/07/7f95c83a-e90e-11e9-9306-

facility that are at risk of being killed, and as to the medical issues of dogs getting sick, there

are hundreds of dogs. According to the monthly statistics of the Animal Facility, in February

2022, 48 dogs were euthanized, in March 2022, 57 dogs were euthanized, in April 2022, 72

dogs were euthanized. Thus in just a three month period of time, 177 dogs were euthanized.[3]

As to the dogs that the Animal Facility has accepted ownership of, the Defendants owe a duty

to abide by the animal cruelty laws. It is animal abuse to withhold medical and to place the

animals in a situation where they are exposed to contagious diseases.[4]

21.     *Commonality* — The cases of the named plaintiffs and members of the proposed class

raise identical and common questions of law and fact concerning the complete lack of any rules,

regulations, standards, guidelines or procedures for the interpretation or enforcement of the

animal laws, which results in i) all of the defendants' ACOs exercising unfettered discretionary

authority to continue to seize and hold plaintiffs' dogs following an alleged bite incident and in

deciding to issue restraint or disposal orders, and ii) the denial of plaintiffs' rights to a prompt

post-seizure, pre-judgment probable cause hearing regarding the warrantless seizure and

retention of their dogs in violation of the Fourth and Fourteenth Amendments to the United

States Constitution. *See* Fed. R. Civ. P. 23(a)(2).

22.     *Typicality* — The unreasonable seizure and due process claims of the named plaintiffs

on account of the conditions of care provided by defendants to their property are typical of

those of the class, and it is expected defendants will raise the same defenses to the claims. *See*

Fed. R. Civ. P. 23(a)(3). The named plaintiffs' claims are typical of the claims of the class

because the named plaintiffs and all class members were or will be affected by the illegal,

---

47cb0324fd44_story.html
[3] These statistics do not include owner/guardian requested euthanasia.
[4] To knowingly and intentionally putting the dog into circumstances where they will catch a
deadly disease is akin to a reckless endangerment.

substandard and criminal conditions their animal properties are kept in after the seizure and retention of their dogs, and who will be affected by the failure to provide due process.  The relief sought by the named plaintiffs is also typical of the class because the nature of the injuries suffered and the costs and additional consequential losses incurred are similar to those suffered by all members of the class.  The named plaintiffs' claims are typical of the claims of the class because the named plaintiffs and all class members were or will be affected in the same manner by the defendant seizing and holding their dogs without providing any hearing in a meaningful time or otherwise, to challenge the continued seizure of their property. The injunctive and declaratory relief sought by the named plaintiffs is also typical of the class because the nature of the violations experienced, extended unreasonable seizures without any process to challenge them, are similar to those suffered by all members of the class.

23.     *Adequacy* — The named plaintiffs will adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(4). Each named plaintiff is a member of the class, his or her claims are coextensive with those of the class, and their interests do not conflict. Moreover, the named plaintiffs and the class are represented by the same attorney and the general counsel for The Lexus Project, Inc. ("Class Counsel")—a 501(c)(3) not-for-profit corporation experienced in and specifically chartered for the litigation of the rights of dog owners whose dogs are alleged to be dangerous. Class Counsel intends to prosecute this action vigorously for the benefit of the entire class.

24.     *Fed. R. Civ. P. 23(b)(2)* — Plaintiffs are entitled to injunctive and declaratory relief declaring the illegal, substandard and criminal conditions in which their animal properties are kept in after the seizure and retention of their dogs occasioned by the failure of the Defendants to maintain Plaintiffs' animal property in conditions at least compliant with the minimum standards set out by the State of Maryland and Prince George's County Legislature and below which the

Legislature has determined to constitute criminal neglect, is unconstitutional and constitutes a per se violation of the Plaintiffs' rights to be free of unreasonable seizures under the 4th Amendment to the U.S. Constitution.  Plaintiffs are entitled to injunctive and declaratory relief declaring the acts of Defendants unconstitutional based upon their failure to grant the named plaintiffs a prompt post-seizure, pre-judgment probable cause hearing, in that the named defendants were acting pursuant to local custom, usage, practice or policy, which vests unfettered discretion in the municipal defendants' animal control officers to seize dogs without rules in an arbitrary and capricious manner, and which does not require municipalities to provide post-seizure, pre-judgment probable cause hearings or any process to timely challenge the seizure.

25.     As all of the foregoing applies to all members of the proposed Class, declaratory and injunctive relief against the Defendants is thus appropriate. *See* Fed. R. Civ. P. 23(b)(2).

### THE HUMAN-ANIMAL BOND

26.     The human-animal bond presents a fundamental property and/or liberty interest protected under the state and federal constitutions.

27.     The American Veterinary Medical Association summarized the findings from a 2006 survey of 50,000 companion animal guardians, which revealed that "[most] people consider their pets to be family members or companions, not property.  The statistics reveal that almost all pet owners feel a strong human-animal bond." *Human-Animal Bond Boosts Spending on Veterinary Care,* JAVMA News, Jan. 1, 2008, http://www.avma.org/onlnews/javma/jan08/080101a.asp. According to the survey, 49.7 percent of guardians viewed their companion animals as "family," while another 48.2 percent considered them "companions." *Id.* Only 2.1 percent of those surveyed viewed their companion animals as property. *Id.* This change in attitude has developed

over the last 30 years, evidencing a major shift in the public's attitude toward companion animals. *Id.* There are over 150 million cats and dogs in this country living with humans in homes - one for every two Americans. *Id.;* see also William C. Root, "*Man's Best Friend":* *Property or Family Member? An Examination of the Legal Classification of Companion Animals and its Impact on Damages recoverable for their Wrongful Death or Injury,* 47 Vill. L. Rev. 423, 423 (2002).

28.     Recent studies show that 45 percent of dog owners take their dogs on vacation; more than half the companion animal owners would prefer a dog or a cat to a human if they were stranded on a deserted island; and 50 percent of companion animals owners would be "very likely" to risk their lives to save their companion animals, while another 33 percent would be "somewhat likely" to put their own lives in danger to save their companion animals. *Id.* In addition to the personal value of companionship that animals offer, studies over the last two decades have confirmed the health benefits derived from human-animal companion relationships.

29.     Considerable evidence indicates that animal companions prolong life and help reduce the frequency of serious disease. *E.g.,* Gregg A. Scoggins, D.V.M., Note, *Legislation without Representation: How Veterinary Medicine Has Slipped Through the Cracks of Tort Reform,* 1990 U. Ill. L. Rev. 953, 973 (1990), citing to several studies demonstrating the benefits of animals in the treatment of handicapped children, the mentally impaired, and the elderly, and showing that the presence of animals has the effect of lowering blood pressure and heart rates. These data further establish that companion animals provide a compensable benefit and are a unique kind of property whose loss cannot and should not be valued like inanimate items of property.

30.     The effects on people interacting with dogs has been well documented. *Friedmann et al.* reported that children's blood pressures lower while resting with a dog and while reading with a dog (Social Interaction and Blood Pressure: Influence of Animal Companions, in *The Journal of Nervous and Mental Disease*, Vol 171, No. 8, 1983), and *Braun et al.* reported similar findings with adults (Physiological Effects of Human/Companion Animal Bonding, in *Nursing Research*, Vol. 33, No. 3, 1984). *Friedmann et al*. also reported a strong connection with pet ownership and survival one year after a heart attack (Animal Companions and One-Year Survival of Patients After Discharge From a Coronary Care Unit, in *Public Health Reports*, Volume 95, No. 4, 1980).

31.     Several U.S. colleges and universities include study of the human-animal bond in their coursework. Some offer a single course, while others offer a certificate program. All may be found in a variety of disciplines. The surprisingly large number of colleges – including highly respected institutions – reflects a growing acceptance of the key role that animals play in our lives.

32.     In 1975, the National Institutes of Health commissioned research entitled "The Human Health Responsibilities of Veterinarians," which was the first official recognition of the triangular interrelationships among people, their veterinarians, and their pets (www.argusinstitute.colostate.edu/history.htm, accessed on 8/7/2007).

33.     In 1999, three organizations (the American Veterinary Medical Association, the American Association of Animal Hospitals, and the Association of American Veterinary Medical Colleges) commissioned an economic study, a significant portion of which addressed the human-animal bond in depth. The study concluded that, "in veterinary practice, recognition of the human-animal bond is an important determinant of successful practice" (www.argusinstitute.colostate.edu/history.htm, accessed on 8/7/2007).

34.     These above examples demonstrate that the bond between a companion animal and a human animal is real and capable of empirical study and analysis. In addition, the human-animal bond is recognized to have financial business implications as well as personal emotional influence.

35.     Research goes further in the study of this bond. We might anticipate and expect that scientists involved in laboratory animal research remain emotionally distant from their subjects, if for no other reason than self-protection. However, the Institute for Laboratory Animal Research Journal in 2002 devoted an entire issue to the *Implications of Human-Animal Interactions and Bonds in the Laboratory,* ILAR Journal Vol. 43 (1) 2002. Kathryn Bayne, D.V.M., reports in her article, *Development of the Human-Research Animal Bond and Its Impact on Animal Well-being* that the bond between animal and human is based on affection and/or respect:

> In the research environment, it is not uncommon for a bond to develop between the investigator, veterinarian, and/or animal care technicians and the animals with which they work . . . . Circumstances that foster the formation of these bonds include the close and frequent contact between the researchers and their animals , . . . the dependency of the animals on the animal care staff for their daily needs . . . .

36.     Dr. Bayne also notes that special bonds can form with certain animals. "A strong contributing factor to the development of a bond is commitment to the animal," in caring for the animal, recognizing the animal's individuality, training the animal, and talking to the animal (http://dels.nas.edu/ilar_n/ilarjournal/43_1/Development.shtml, accessed on 8/7/2007).

37.     In fact, a 2001 American Animal Hospital Association survey reported that 44 percent of pet owners would spend $3000 or more to save their pet's life, and 21 percent would travel 1000 miles or more to obtain specialty care for their pet. A Pfizer Animal Health/Gallup Organization

Dog Owner survey reports that more than 75 percent of pet owners say their dog's health is as important to them as their own (http://www.argusinstitute.colostate.edu/hab.htm, accessed on 8/7/07). These kinds of owner attitudes reflect that owners are willing to demonstrate behaviorally that they believe their relationship with their dog is one-of-a-kind.

38.     This relationship between a companion animal and a human animal is bidirectional. Tannenbaum describes this as a relationship that benefits both parties and is mutually voluntary (*The health benefits of pets*. NIH Technology Assess Statement Online 1987 Sep 10-11 [accessed 8/7/07]; (3)). From the time a person brings an animal into his/her household, the two interact with and affect each other. The training that the person provides, caring for the dog's daily needs, taking the dog with her to work and on outings, talking with the dog – all serve to strengthen the bond bidirectionally. The more attention an owner gives to a dog, the more likely that dog is to communicate behaviorally in response. This two-way interaction will mold itself into a personalized, unique relationship, and the relationship has the potential to grow.

39.     The above allegations are illustrative only of the empirically and methodologically demonstrable human-animal bond. More recent and ongoing scientific evidence amplifies and further develops these tenets of long-standing scientific acceptance.

## FACTUAL ALLEGATIONS

### I.  Population Make-Up of Prince George's County

40.     According to the US Census Bureau, 64.1 percent of residents of that County are "Black or African American alone".
https://www.census.gov/quickfacts/fact/table/princegeorgescountymaryland/RHI225221.

41.     Hispanics make up 20.4 percent of the County population according to the US Bureau of Census.

42.     Thus 84.5 percent of the population are a minority class.

43.     Of the 955,306 people (population estimate, July 1, 2021) 807,233 persons are a minority class.

**II.     Prince George's Animal Facility**

44.     Upon information and belief that there are hundreds of pit bulls in the Animal facility that are at risk of being killed, and as to the medical issues of dogs getting sick, there are hundreds of dogs.

45.     According to the monthly statistics of the Animal Facility, in February 2022, 48 dogs were euthanized, in March 2022, 57 dogs were euthanized, in April 2022, 72 dogs were euthanized.

46.     Thus in just a three month period of time, 177 dogs were euthanized.[5]

47.     According to emails sent to volunteers from Ramera, the Kennel Manager of the Animal Facility, a quarantine was imposed in the "restricted" area until July 17, 2022 due to Parvo.

48.     Bella and Mimi were detained at the Facility from July 6, 2022 to July 22, 2022.

49.     The "restricted" area is where the "Pit Bulls" are housed.

50.     The "restricted" area is where Bella and Mimi were housed.

51.     Defendant Littlejohn was carbon copied on the emails sent to the volunteers.

52.     Defendant Cooke informed Plaintiff Sophia Venero, that due to the Parvo outbreak the shelter was currently facing, they wouldn't be able to see the dogs until after July 15th.

53.     However, Defendant Cooke represented to the Court that there was no concern about Parvo *vis a vis* Bella and Mimi.

---

[5] These statistics do not include owner/guardian requested euthanasia.

**III.     Plaintiffs and their dogs Bella and Mimi**

54.     Plaintiff owns two dogs named Bella and Mimi.

55.     Both Dogs are Plaintiff Denise Venero's Emotional Support dogs.

56.     Bella is an eight year old Labrador Retriever Mix that was adopted from the Montgomery County Animal Services in 2014.

57.     Bella is microchipped.

58.     Prince George's County Department of the Environment, Animal Services Facility issued a renewal dog license to Bella on September 13, 2021, with License Number 12104.

59.     The Dog License Application states that Bella's "Predominant Breed" is "Mixed Breed."

60.     Bella has been legally registered in Prince George's County since 2014.

61.     Bella has health problems which require her to be treated with medication, and is on a special diet as a result of her condition.

62.     Mimi is a four years old and her dad is a Yorkshire Terrier/Havanese and her mom is a Labrador Bulldog.

63.     Mimi was rescued from a neighbor.

64.     Mimi has also been licensed in Prince George's County since 2017, however, the County was unable to find her paperwork, so on July 5, 2022 a new dog license was issued for Mimi.

65.     The license receipt states that Mimi is a "S. Mastiff, Brown white dog".

66.     Both dogs are female and have been spayed.

67.     The Banfield Pet Hospital Medical Summary Report, dated 3/19/2022 identifies Mimi as a "Terrier, Yorkshire."

68.     Plaintiffs love Bella and Mimi as if the dogs were their children.

69.     Bella and Mimi are Plaintiff Denise Venero's Emotional Support Dogs.

70.     The bond between Plaintiffs and Bella and Mimi is strong and the dogs are treated like they are a member of their family.

71.     Plaintiff Denise Venero has been emotionally supported by Bella and Mimi from the time she obtained them.

72.     One of the primary reasons she obtained the dogs was for them to provide her with support due to the depression and anxiety issues she was experiencing prior to obtaining them.

73.     Bella and Mimi have pulled Denise out of her depression and anxiety.

74.     Without them, Denise is falling back into depression, anxiety, and nervousness, and her ability to function without them has been severely compromised, affecting her daily life, including work, schooling, relationship with others, and coping mechanisms.

75.     Plaintiffs were born in Peru, and their parents have limited understanding of the English language.  Their father can understand some English, but is unable to speak English.

76.     The home from which Defendants removed Plaintiffs dogs, is owned by Plaintiff Stephany Venero.

77.     Plaintiff Denise Venero lives in that home with her parents, and until they were impounded, with Bella and Mimi.

78.     Plaintiff Stephany Venero is the landlord of Plaintiff Denise and her parents.

79.     On a monthly basis, the tenants pay Stephany Venero's mortgage payments as rent.

80.     Plaintiff Denise Venero is currently in her third year of school studying to be a physical therapist doctor, and is also employed part-time.

81.     Plaintiff Sophia Venero is a third-year Medical Student in New Jersey.

82.     Plaintiff Stephany Venero is a licensed dietitian nutritionist in Prince George's County.


**IV.     The Incident**

15

83.     On July 4, 2022, a family member thought they had closed the gate at Plaintiff Venero's house, but the gate did not fully latch, and Bella and Mimi were able to exit the fenced in area.

84.     Bella and Mimi exited the fenced in yard through the open gate, when they heard a neighbor's dog barking.

85.     Plaintiff Denise Venero's property has a fenced in yard for the dogs, and the gate which was not fully closed has now been modified with a self-closing mechanism to ensure that the gate will always close on its own.

86.     Plaintiffs have never had any issue with being unable to restrain their dogs.  They are well behaved and listen to them.  They can control the dogs, and there are no issues related to that.  This was human error and it will never happen again because the gate now closes automatically.

87.     Plaintiffs' father immediately followed them in his car, and other family members went on foot to retrieve the dogs.

88.     Bella and Mimi, and the neighbor's dog – which was tied to a tree – got into a fight.

89.     All three dogs had wounds from the fight.

90.     Plaintiff's father arrived at the neighbor's property and called for Bella and Mimi, who then immediately jumped into the father's vehicle.

91.     When Plaintiff approached the neighbor's she encouraged them to get medical care for their dog.

92.     After asking the owners for permission to check out their dog, Plaintiff Denise Venero was bitten by the neighbor's dog when she approached it to check on its injuries.

93.     The reason she approached the dog and asked for permission to approach the dog is that the owners of that dog did not seem concerned about the condition of their dog.

94.     On July 6, 2022, in response to a notice left at Plaintiff Denise Venero's house to call an Officer Cooke, she telephoned Officer Cooke.

95.     He told her that Animal Control will be coming to take Plaintiffs dogs and there was nothing they could do to stop it.

96.     At about 8:00 pm on July 6, 2022, animal control officer Deppner arrived at Denise Venero's home with a police officer, and another police officer joined them shortly thereafter.

97.     Plaintiff Denise Venero asked if the dogs needed to go with them and the police officer said that they did.

98.     When Plaintiff Denise Venero asked under what grounds they were taking the dogs, the animal control officer mentioned that the dogs were deemed "dangerous".

99.     On July 6, 2022, after the dogs were impounded by Defendants, animal control officer Deppner handed Plaintiff Denise Venero a Prince George's County Government, Department of the Environment, Animal Management Division Incident/Investigation Report.

100.    Plaintiffs gave the ACO Deppner Bella's special food that was prescribed by the Veterinarian for her medical condition.

101.    The Incident/Investigation Report states,

> Both dogs have been impounded for Animal Control Commission hearing/Dangerous dog
>
> A breed evaluation will be conducted to confirm the breeds of each dog.

## V.     After the Incident

102.    On July 7th, 2022, Plaintiffs Denise Venero and Stephany Venero, both called Officer Cooke and left multiple messages to inquire for more information about why Bella and Mimi were taken from their home.

103.    They also asked what steps they needed to take to get their dogs back home.

104.    Neither Denise Venero nor Stephany Venero received a call back.

105.    On July 8, 2022, Sophia Venero called and left a message for ACO Cooke.

106.    She then contacted Animal Management Division and explained to the lady who answered her call that her family has been trying to contact Officer Cooke.

107.    The lady whom Sophia Venero spoke to mentioned that she will leave a message for him to call her back.

108.    Two hours passed and Officer Cooke returned her call from his personal phone (240-841-8015).

109.    Sophia asked ACO Cooke how Bella and Mimi were doing.

110.    He said that he does not know but most likely they are fine.

111.    Sophia informed ACO Cooke that Bella, who is a senior, has dietary restrictions and that they gave ACO Deppner her special food and proceeded to ask him why the dogs were taken.

112.    Officer Cooke explained that the dogs were taken due to an attack on the neighbor's dog and they were deemed dangerous.

113.    Sophia asked him about what the next steps entail and he mentioned that they will be receiving a notification from his department.

114.    ACO Cooke said he was going to write the Notice of Violation that day and that it would be postmarked by Monday, July 11th, and that this Notice of Violation would state that Bella and Mimi are not going to return home.

115.    However, ACO Cooke told her that they could appeal this decision by paying $150 per dog.

116.    ACO Cooke also mentioned that once the appeal is paid and processed, this will go to the commission board and the board will provide them with a court date.

117.    ACO Cooke informed Sophia that the dangerous dog hearing and the appeal will be a combined case.

118.    Sophia asked him when the hearing for the appeal will take place, and ACO Cooke went on to explain that there are currently 8 dogs ahead of Bella and Mimi who are waiting for a court date, and that the dog that is next in line to receive a hearing has been there since January 2022.

119.    Sophia asked him what was causing this delay and he mentioned that this is due to the department undergoing restructuring twice since January, and that there is a vacant position for the Director of the Animal Commission Board Member which is what is causing these hearing delays.

120.    He mentioned these hearings usually occur twice a month on Wednesdays through Zoom.

121.    The Animal Control Commission's "Hearing Dockets" on Prince George's County's website shows that the most recent hearings held by the Commission for Animal Control were last conducted on February 23, 2022.[6]

122.    As shown on the Docket Hearing website, Eugene Fernandez's dog was running at large in October of 2021.  And it was not until February 23, 2022, five months later, that a hearing was finally held.  Id.

123.    As shown in the January Hearing Docket, Charles Tran'dae's dog attacked another dog in September 2021.  The hearing was not held until three and a half months later on January 12, 2022.[7]

---

[6] Available at
https://www.princegeorgescountymd.gov/AgendaCenter/ViewFile/Agenda/2144?html=true
[7] https://www.princegeorgescountymd.gov/AgendaCenter/ViewFile/Agenda/_01122022-2097

124.    Prince George's County Commission for Animal Control have not held any hearings since February 2022. *See* Prince George's County website at https://www.princegeorgescountymd.gov/AgendaCenter/Animal-Control-Commission-29.

125.    Sophia informed ACO Cooke about her knowledge of requesting a preliminary hearing and he mentioned he wasn't sure if these are being held at the moment.

126.    ACO Cooke appeared to be a bit surprised when Sophia mentioned the topic of a preliminary hearing.

127.    ACO Cooke told her that the person who schedules these hearings, Edward Jefferson, "is out of town."

128.    Sophia asked for his contact information and email address.

129.    Sophia requested a video of the incident but ACO Cooke claimed that they needed a lawyer to contact the Chief Deputy, Terri LittleJohn, and he provided her with Terri's email address (Tylittlejohn@co.pg.md.us).

130.    Sophia concluded the call by asking when the family can visit Bella and Mimi and he mentioned that this is only allowed and scheduled by the officer taking the case, which was, in this case, himself, and only if he deems that it is appropriate.

131.    ACO Cooke then explained that as soon as we submit the appeal and he submits it to the commission then he can proceed with scheduling visitation hours.

132.    ACO Cooke also mentioned that due to the Parvo outbreak the shelter was currently facing, they wouldn't be able to see the dogs until after July 15th.

133.    ACO Cooke told her that the facility is in the process of a cleaning.

134.    ACO Cooke asked her the name of the person he should be addressing the Notice of Violation to.

135.     Sophia explained that Bella and Mimi are family dogs and that she would consult with the family and would let him know of their decision.

136.     ACO Cooke provided her with his personal cell phone number and suggested that she text him with this information.

137.     On Friday, July 8th, 12:45 pm, Sophia texted ACO Cooke with the information to whom the Notice of Violation should be addressed – that being Denise Venero, her sister.

138.     Sophia also inquired of ACO Cooke about the neighbor's dog who bit her sister, Denise, and asked him if the dog was up to date with the rabies vaccine and ACO Cooke provided Sophia with the most recent vaccination date.

139.     She also asked him for his email address so that she could send him an email with Bella and Mimi's vaccine records.

140.     On Friday, July 8th, 2:46 pm, Sophia telephone Edward Jefferson but the number that was provided by Officer Cooke was incorrect.

141.     She then texted Officer Cooke requesting another number so that she could reach Mr. Jefferson.

142.     Sophia then immediately called Mr. Jefferson and left him a voice mail requesting a preliminary hearing.

143.     On Friday, July 8th, 11:18 pm, Sophia and Denise found the "Code of Ordinances" online and educated themselves on the law as best they could.

144.     They discovered that the Animal Control Department was supposed to have sent a notice within 48 hours of the impoundment of Bella and Mimi notifying them of their right to a preliminary hearing.

145.    They also learned additionally that Defendants should have scheduled this hearing within 72 hours of them receiving the notice.

146.    On July 8, 2022 Plaintiff's sister Sophia Venero, on behalf of herself and her sisters, including Plaintiff, sent an email to Edward Jefferson ( Citizen Service Specialist) CC Officer Cooke ( jccooke@co.pg.md.us) and Terri LittleJohn (tylittlejohn@co.pg.md.us), requesting that preliminary hearing be conducted pursuant to Ordinance 3-136.

147.    Prince George's County Ordinance Section 3-136(c) mandates that once a dog is impounded under that dangerous animal ordinance, "the owner shall be notified within forty-eight (48) hours of the impoundment of a right to a preliminary hearing."

148.    The purpose of the preliminary hearing is,

> for the sole purpose of determining whether the owner of the animal is capable of restraining the animal from attacking, biting or injuring any human being or other animal until it can be determined at a hearing conducted by the Animal Control Commission whether the animal is dangerous.

149.    No notice was ever provided to Plaintiff, let alone within 48 hours of the impoundment, that she had a right to a preliminary hearing.

150.    On July 11, 2022 at 9:00 AM a response was sent from Edward Jefferson, Citizen Services Specialist, Prince George's County Government, stating,

> This message is to confirm receipt of your request for a preliminary hearing. I will need to confirm with Animal Services Division the breed of the dogs in question. Please be advised, if the dogs have been determined to be Pit Bulls a preliminary hearing cannot be granted as they are an illegal breed for the county. If they are not Pit Bulls, I will add your preliminary hearing to the hearings scheduled for the afternoon of Wednesday, July 13, 2022. The hearing is conducted virtually via Zoom. Once I confirm with Animal Services Division, I will follow up with you regarding this matter. Stay safe and have a great day.

151.    At 11:36 AM on the same day, July 11, 2022, Mr. Jefferson again emailed Plaintiff

stating,

> I have received notification from Animal Services Division that the
> dogs have been determined to be Pit Bulls. As such, a preliminary
> hearing will not be granted. Your case will be scheduled for a future
> Commission for Animal Control hearing date. Stay safe and have a
> great day.

152.    Plaintiff's sister responded to the above email on July 11, 2022 at 11:48 AM, informing

him that the dogs were not Pit Bulls and provided supporting documentation showing their

breeds,

> Thank you for the quick response. Bella and Mimi are both not Pit
> bulls. They are both mixed breeds. Bella was adopted in2014 from
> the Montgomery County Shelter. She is a lab mix. Mimi's parents
> are American bulldog/ Yorkie/ shiatsu. I am attaching her
> documents. Can you please provide me with a detailed explanation
> of the breed determination?
>
> I also have an animal trainer on board that is willing to assess the
> dogs and fix any behaviors in the meantime if you guys allow them
> to.

153.    Mr. Jefferson responded on July 11, 2022 at 11:57 AM stating,

> Animal Services Division are responsible for the breed evaluations.
> From my knowledge, if the dog in question has the distinguishing
> characteristics of a Pit Bull then it is deemed as such. Any evidence
> to prove otherwise should be provided to Animal Services Division
> as I have no authority in overriding their determination. I have
> copied a Supervisor to this email chain to assist in communication.

154.    Sophia Venero responded on July 11, 2022 at 12:57 AM,

> Thanks for the quick response. So from what I understand, the
> Animal Service Division handling the case or Officer Cooke,
> deemed my dog Pit bulls? Either way, this is a subjective and
> intangible decision. Like I said in my earlier emails, Bella (8yo) was
> adopted from Montgomery County Shelter in 2014 and she was

23

registered as a Lab/ Mix Retriever(attaching her legal paperwork). Mimi (4yo) is a Mixed breed (looks like a Mountain Cur). This breed evaluation should be more extensive and not just subjective to one person. The police officer informed us that our dogs will be undergoing a DNA dog test. I am appealing this decision for both Bella and Mimi. I am attaching their vet paperwork along with Bella's Montgomery County legal documentation. I am also in the process of obtaining a letter from Mimi's parent's pet owners that certify the breed of her parents. Bella and Mimi are loving family dogs that deserve a fair trial and decision. I am asking for them to be assessed and evaluated properly. I already have contacted several authorities and representatives to see if they can help us with this matter.

155.    On July 12, 2022, given that she had not received a response to her prior email above, Sophia Venero sent an email to the County (ELJefferson@co.pg.md.us, teroberts@co.pg.md.us, jcocooke@co.pg.md.us, tylittlejohn@co.md.us ) stating "I am still awaiting a response from the department to proceed with the preliminary hearing tomorrow as previously discussed. We provided sufficient documentation to prove that Bella and Mimi are not Pit bulls."

156.    On July 12, 2022 Sophia Venero emailed Defendants about Bella's medical condition, which was previously discussed over the telephone with Officer Cooke,

Bella is a senior. She is eight years old and needs specific medical attention. Bella is being treated for recurrent Nephrolithiasis, which can lead to recurrent urinary tract infections. She has a special diet that is ABSOLUTELY ESSENTIAL which was informed to the Officers when she was wrongfully impounded. She needs to be monitored closely which entails checking her urine to make sure it is not too concentrated and there are no traces of blood. She must stay adequately hydrated and be provided with her special diet. It is imperative to her health and well-being that she is receiving special care while awaiting the preliminary hearing.

157.    That email also explained that the dogs were never supposed to be taken since the dogs were not " at large", and that their dad had been in immediate pursuit of the dogs following their accidental escape.  She also informed them that they still have not mailed their notice of

24

Violation which was supposed to be mailed within 48 hours of removing Bella and Mimi from home.

158.   On July 13 at around 4:00 pm Plaintiff Stephany Venero called Defendant Terri Littlejohn at 301-780-7274 as she was worried about their dogs.  Ms. Littlehohn did not answer, so Stephany left a message on voicemail.

159.   Stephany never received a call back form Defendant Littlejohn.

160.   On July 13, 2022, Sophia Venero again emailed the County stating,

> It has been 72 hours since Bella and Mimi were deemed Pit bulls and 23 hours since my previous email attaching all the documentation regarding my dog's breed. I am still waiting for a response.
> Since the incident (4th of July), we have not received any official written letter communication. Nor have we received any response/ updates. We want to know how they are doing, especially Bella, she needs her special food (which was provided). We have the right to know how they are.

161.   On July 15, 2022 Sophia texted ACO Cooke to check on Mimi and Bella since he did not respond to her latest emails, and asked him about his response to the documents that they had presented to the County for the breed evaluation.

162.   ACO Cooke texted her back telling her that he was on medical leave and that he had not heard anything negative regarding the dogs' current conditions.  He also claimed that he had no input in the breed determination.

163.   Sophia then responded by text asking him who is taking over his cases while he is on medical leave and he said that his Supervisor, Tanya Roberts (whom Sophia had been emailing as well at teroberts@co.pg.md.us) is taking over his cases.

164.   He informed her that the breed evaluation is conducted by the shelter, and that Deputy Chief LittleJohn has the last say.

165.   Prince George's County Ordinance 3-185.01 titled "Pit Bull Terriers" states,

> (a)   Except as provided below, no person shall own, keep, or harbor a Pit Bull Terrier within the County.
>
> (b)   Any person owning a Pit Bull Terrier prior to November 1, 1996, may continue to harbor the animal on his premises under the following conditions * * *

166.   The definition of a "pit bull" is set forth in Ordinance 3-101, and is as follows,

> Pit Bull Terrier shall mean any and all of the following dogs:
>
> (A) Staffordshire Bull Terrier breed of dogs;
> (B) American Staffordshire Terrier breed of dogs;
> (C) American Pit Bull Terrier breed of dogs;
> (D) Dogs which have the appearance of being predominantly of the breed of dogs known as Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier. Predominantly shall mean that the dog exhibits the physical characteristics of a Pit Bull Terrier more than any other breed of dog;
> (E)   Dogs which have been registered at any time as a Pit Bull Terrier.

167.   The law further states that if any pit bull within the county injures a person or another animal at any time, it will automatically be "destroyed." *Id.* § 3-116.01(b).

168.   A violation of Ordinance 3-185.01 is a criminal offense,

> Sec. 3-116.01. – Criminal penalties; violations.
> (a)   Any person found to have violated any provision of Section 3-185.01 shall be fined up to $1,000.00 or may be sentenced to not more than six (6) months of imprisonment.
> (b)   A Pit Bull that causes injury to or kills a human being or a domestic animal without provocation shall be humanely destroyed, and the owner of such dog shall be fined up to $1,000.00 or may be sentenced to not more than six (6) months of imprisonment.

169.   Sophia further inquired about visitation hours and ACO Cooke said that the "visitation hours are not allowed and it is under the discretion of the officer who is in charge of the case".

170.   She asked him if there is a timeframe in which this can be scheduled and he claimed that he will contact her upon his return.

171.    On Friday, July 15th, 2022 between 4:14 PM and 4:18 PM, Sophia called Tanya Roberts at 301-780-7230 and left her a Voicemail.  She also called Terri LittleJohn, Chief Deputy, and left her a Voicemail at 301-780-7274.

172.    She never heard from either of them.

**VI.     Notice of Violation dated July 11, 2022**

173.    On July 15, 2022, Plaintiff Denise Venero received a Notice of Violation from the Prince George's County Government, Department of Environment, Animal Services Division Deputy Associate Director, T. Littlejohn. (Exhibit A).

174.    Although this Notice of Violation was dated July 11, 2022 it was not postmarked until July 12, 2022.

175.    On July 19, 2022 this Notice of Violation also arrived via certified mail.

176.    The Notice of Violation alleges Plaintiff's two dogs attacked another dog and "caused severe injury."

177.    According to the Notice of Violation dated July 11, 2022, an "order was put out to impound the animals pending a vicious dog hearing.

178.    The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance Section 3-131(c),

> "Section 3-131(c) 'Manner of keeping animals – No person shall keep or maintain any animal in Prince George's County in such manner as to cause or permit animal to be a public nuisance.'"

179.    Prince George's County Ordinance Section 3-131(c) titled "Manner of keeping animals; prohibition of nuisances" states,

> No person shall keep or maintain any animal in Prince George's County in such manner as to cause or permit the animal to be a public nuisance or to cause or permit the animal to cause a public

> nuisance condition. No person shall keep or maintain any animal in the County in such manner as to disturb the peace, comfort, or health of any person residing within the County.

180.   The Notice of Violation alleges that the dog attack incident violated Prince George's

County Ordinance "Section 3-135 –'Animals at Large Prohibited.'"

181.   Prince George's County Ordinance Section 3-135 titled "Animals at Large Prohibited"

states at part (a),

> It shall be unlawful for the owner or custodian of any animal (including, but not limited to, any cattle, horse, mule, swine, sheep, goat, geese, ducks, chickens, dog, cat, or other animal) to permit the animal to run at large or be at large as defined in Section 3-101(7) within Prince George's County, Maryland.

182.   Section 3-135(e) authorizes an Animal Control Officer to impound the animal, and

failure to surrender the animal immediately to the ACO is a misdemeanor.

183.   Section 3-135(g) states, "No animal running at large by accident with a person in

immediate pursuit of it shall be deemed to be at large, running at large or a stray."

184.   The Notice of Violation alleges that the dog attack incident violated Prince George's

County Ordinance "Section 3-136 – 'Dangerous Animals'"

185.   Section 3-136 is titled "Dangerous Animals", and section (a) of this Ordinance does not

include in the definition of a dangerous animal a dog that injures another dog,

> Any animal that without provocation (i) inflicts injury on a human on private or public property; (ii) kills a domesticated and/or farm animal; or (iii) has been previously found to be potentially dangerous because of injury inflicted on a human or an animal, the owner having received notice of such and the animal again aggressively bites, attacks, or endangers public safety is defined to be a dangerous animal for the purpose of this Subtitle.

186.   According to Section (b) of the dangerous animal ordinance, Section 3-136,

> It shall be the duty of the Police Department to receive and document complaints concerning dangerous animals. It shall be the

> duty of the Administrator/Animal Control Officer to receive and investigate complaints concerning dangerous animals.

187.    According to Section3-136(b) of the of the dangerous animal ordinance, an animal control officer can impound a dog pending a hearing, if the ACO reasonably believes the owner of the animal is not capable of restraining the animal from attacking a human or another animal,

> Whenever an animal complained against shall be reasonably deemed by a police officer or the Administrator/Animal Control Officer to be a dangerous animal, the police officer or Administrator/Animal Control Officer shall report the fact to the Commission in the form of a written complaint and shall be authorized and empowered to impound the animal pending a hearing if he reasonably believes that the owner of the animal is not capable of restraining the animal from attacking, biting, or injuring any human being or other animal pending a hearing on whether the animal is dangerous.

188.    According to Section (b) of the of the dangerous animal ordinance, Section 3-136, "Notwithstanding the above, whenever an animal causes severe injury to any human being, the police officer or Animal Control Officer shall impound the animal pending a hearing by the Commission."

189.    According to Section 3-136(c),

> The preliminary hearing shall be scheduled within seventy-two (72) hours of a written request by the owner. This preliminary hearing may be conducted by a hearing officer designated by the Commission and shall be for the sole purpose of determining whether the owner of the animal is capable of restraining the animal from attacking, biting or injuring any human being or other animal until it can be determined at a hearing conducted by the Animal Control Commission whether the animal is dangerous.

190.    According to Section 3-136(d),

> If it is determined that the alleged dangerous animal may be returned to the custody of the owner until the scheduled full hearing, the Commission may impose such requirements of conditions as are deemed necessary to restrain the animal and the owner shall be required to pay the costs and maintenance expenses incurred during

the time that the animal was impounded. Should the owner not adhere to conditions set forth by the Commission, the alleged dangerous animal shall be immediately impounded and remain in the custody of the County pending the outcome of the full hearing.

191.   Section 3-136(e), states, "If the Commission determines that continuing impoundment is

necessary, the owner shall be responsible for all costs and maintenance expenses incurred."

192.   The Animal Control Commission " shall conduct a public hearing upon the question of

whether the animal is a dangerous animal in accordance with the provisions of Section 3-110 of

this Subtitle." *See* Section 3-136(g).

193.   Section 3-110 sets forth the "hearing procedures" for a dangerous dog hearing.

194.   According to Section 3-110(e),

The Commission shall give notice in writing by regular mail to the complainant, the person charged or the appellant of a violation notice or citation, of the time and place of a public hearing. The Commission shall also send notice by personal delivery, or by certified mail, return receipt requested, to the person charged.

195.   According to Section 3-110(i),

At the close of all the evidence, the Commission shall deliberate and shall issue written findings of fact, conclusions, and an appropriate order. If the Commission finds that a violation did not occur, it shall dismiss the complaint or citation. If the Commission finds that a violation has occurred, or that an animal is a public nuisance animal, or that a public nuisance condition exists, it may impose civil penalties pursuant to Section 3-116. In lieu of or in addition to imposing civil penalties, it may require appropriate affirmative action, including but not limited to:
(1) The mandatory restriction or confinement of the animal under such conditions as the Commission may direct in its discretion;
(2) The mandatory destruction or other disposition of the animal as the Commission may direct in its discretion;
(3) The correction of conditions or methods of animal care, keeping, maintenance, housing, or veterinary treatment as the Commission may direct in its discretion to include spaying and neutering;
(4) A recommendation to the Director that licenses issued under this Subtitle be suspended or revoked;

(5) A restriction of animal ownership for a period up to five (5) years from the date of determination subject to the right to petition the Board for a waiver based on good cause shown;

(6) A recommendation to the State's Attorney for criminal prosecution of violations of this Subtitle or of other laws.

196.   Section 3-111 provides for an appeal from the Commission's order regarding a dog as

dangerous,

> Any party, including Prince George's County, Maryland, aggrieved by a final order of the Commission in a contested case, whether such decision is affirmative or negative in form, is entitled to appeal that order to the Circuit Court for Prince George's County, within fifteen (15) business days of the date of the order. Such appeal shall be governed by the provisions of the Maryland Rules pertaining to administrative appeals. The decision of the Circuit Court in all appeals from decisions of the Commission shall be final.

197.   According to Section 3-136(h)

> If the Commission, upon the evidence before it, finds that the animal complained of is in fact a dangerous animal, as defined in Subsection (a), above, and Section 3-101(32), the Commission may direct the owner or custodian of the dangerous animal to confine the animal and to abate its danger to the public in accordance with Section 3-137 herein, or require the owner or custodian of the dangerous animal to surrender the animal to the County and authorize the Administrator to destroy the animal.

198.   The Notice of Violation alleges that the dog attack incident violated Prince George's

County Ordinance "Section 3-142 'Irresponsible Pet Owner'"

199.   Section 3-142(a) provides,

> An owner or custodian shall be declared to be an irresponsible owner if:
> (1)  they allow their animal to inflict bites on a human or another domesticated animal either on public or private property;
> (2)  they allow their animal to chase or approach a person in a menacing fashion or apparent attitude of attack, or with a known propensity, tendency, or disposition to attack unprovoked, to cause injury, or otherwise to threaten the safety of humans or animals;
> (3)  they fail to provide proper care and treatment for an animal;

(4)   they fail to provide humane training for appropriate temperament and response;

(5)   they fail to take precautions to abate aggressive behavior; prevent an imminent threat, assault or disturbance; or ensure surrounding circumstances and environment do not create or give rise to potentially dangerous situations.

200.   The Notice of Violation alleges that the dog attack incident violated Prince George's County Ordinance "Section 3-182 'Potentially Dangerous Animals.'"

201.   Section 3-182 (a) states,

> The owner of a dog identified as potentially dangerous shall establish to the satisfaction of the Administrator that:
> (1) The owner of the potentially dangerous dog is 18 years of age or older;
> (2) A valid pet license has been issued for the potentially dangerous dog;
> (3) The potentially dangerous dog has current vaccinations;
> (4) The owner has a proper enclosure, as determined by the Administrator, to confine the potentially dangerous dog;
> (5) The potentially dangerous dog has been spayed or neutered;
> (6) The potentially dangerous dog has been implanted with a microchip containing owner identification information; and
> (7) The owner has written permission of the property owner, if the dog owner is not the property owner, and from a homeowner's association, if appropriate, to house the dog on the premises where the dog will be kept.

202.   Section 3-182 (b) states,

> (b) Failure to establish the above criteria to the satisfaction of the Administrator, shall result in immediate impoundment, if the subject animal is not already in the possession of the County. If the dog is impounded, the owner may appeal the Administrator's decision regarding any of their recommendations within ten days of receiving notice if they do not agree. They may file a written petition with the Commission for Animal Control for return of the animal.

203.   The Notice of Violation states,

> After thoroughly reviewing your case, the following decision has been made regarding your case.
>
> **We do NOT intend to return these animals to you.**

(Emphasis in original)

204.    The Notice of Violation advises that if Plaintiffs wishes to appeal this decision to not return the dogs to her, she "must post a non-refundable appeal bond in the amount of "**$150.00 PER DOG** [ ] in accordance with Section 3-106, item (e) of the Prince George's County Animal Control Ordinance."

205.    The bond must be paid to Animal Services Division at 3750 Brown Station Rd, Upper Marlboro, Maryland 20772 no later than no later than 4:00 P.M. Saturday July 22, 2022.

206.    The request for an appeal must be in writing, and must contain a copy of the bond receipt, and must be received by The Commission for Animal Control, 1801 McCormick Drive Suite 500, Largo, Maryland 20774, no later than 4:00 P.M. July 22, 2022.

207.    If an appeal is not requested "the animal will become the property of Prince George's County."

208.    Additionally, this bond, according to the Ordinance, may be required to be paid every thirty days, despite a hearing not being provided until six months or more after the seizure of the animals.  *See* Ordinance Section (e)(1) of 3-106(e)(1).

209.    Section 3-106 is titled "Fees for boarding and care of animals; security."

210.    Section (e)(1) of 3-106 states,

> A person claiming a proprietary interest in any animal confined pursuant to Sections 3-122, 3-123, 3-131 through 3-138, 3-140, 3-141, 3-175, 3-176, 3-180, or Division 7 of this Subtitle may prevent disposition of the animal after the required holding period, pending a Commission for Animal Control hearing, by posting a bond, cash or corporate surety, with the Administrator prior to the expiration of the required holding period in an amount sufficient to secure payment for all reasonable expenses incurred in caring and providing for the animal, including estimated medical care, for at least thirty (30) days; provided, however, that such bond, cash or corporate surety, shall not prevent the Administrator from disposing of such animal at the end of the thirty (30) day period covered by

the bond, cash or corporate surety, unless the person claiming an interest posts an additional bond, cash or corporate surety, with the Administrator to secure payment of reasonable expenses for an additional thirty (30) days, and does so prior to the expiration of the first 30-day period.

## VII.   Bella and Mimi Have Kennel Cough and Defendant Cooke required a Breed Evaluation to be signed before releasing the dogs to Plaintiff Denise Venero

211.   On July 22, 2022 at a TRO hearing before this Court, Defendants represented to the Court that the dogs were fine and that the Facility housing the dogs did not have any issues related to communicable diseases or outbreaks.

212.   Defendant Cooke represented to the Court that the special prescribe food for Bella had run out, and that he had informed them that the food had run out, and that Plaintiffs were not concerned.

213.   This is a false statement.  At no time did Defendant Cooke ever inform Plaintiffs that Bella's prescribed food had run out.  If he had, they would have immediately delivered additional prescribed food to the Animal Facility for Bella.

214.   Based upon an Agreement between the parties, it was agreed that Plaintiffs could retrieve their dog from the Prince George's County Animal Facility (P.G. Animal Shelter) and place the dogs in a Kennel outside of Prince George's County.

215.   It was also agreed that Plaintiffs would pay Defendants for the cost of boarding at the Prince George's Animal Shelter, and Department of the Environment Director Andrea L. Crooms informed Plaintiffs' counsel by email that "[t]hey should bring a check or money order with them when arriving to redeem the animals[ ]" and that the total for the care of the dogs was $190.00.

216.   On Saturday July 23rd, Plaintiff Denise Venero telephone Defendant Cooke at approximately 9:00 a.m. to arrange a pick-up time for Bella and Mimi.

217.   They agreed that Denise could pick up Bella and Mimi at 11:30 a.m.

218.   When she arrived at the Prince George's Animal Shelter, she was directed to the cashier station where the cashier handed her a piece of paper to sign and told her it had to be signed before the dogs would be released.

219.   Denise was very surprised to receive this paper titled "Breed Evaluation" (Exhibit F) because no mention of this was discussed between the parties during the TRO hearing the day before.

220.   The "Breed Evaluation" document was already signed by "J. Cooke #908:, and the date line next to the section Denise Venero was required to sign was already filled in with the date of July 23, 22,



221.   The document stated,

> On July 7, 2022 the following one Fawn with white dog named "Bella" and one Brindle with white dog named "Mimi" were impounded from Denise Venero, 5402 Odell Road Beltsville MD 20705 and brought to the Prince George's County Animal Services Facility. The dogs were brought forth by the impounding officer for a breed evaluation. Lead Animal Control Officer Cooke (badge #908), Supervisor Roberts (badge #918) and Deputy Chief Littlejohn (badge #902) conducted the breed evaluation on these dogs and found the dogs to have the appearance and physical characteristics of being predominantly of the breed known as a American Pit Bull Terrier mix, which falls under the Pit Bull Law. Therefore, it has been determined that the dog is illegal to own, harbor and have possession of in Prince George's County.  This dog must be removed from Prince George's County immediately. Failure to comply may result in legal action being taken against the owner/custodian and the dogs impounded.

222.    Denise immediately called her attorneys to let them know the shelter was requesting that she sign this form in order for them to release the dogs.

223.    Because she was desperate to get Bella and Mimi back, she signed the document with a handwritten notation indicating that she was signing it under duress,

*signing under protest solely to get my dogs release. I do not agree with this evaluation. Was not provided notice that I would need to sign for release. Litigation has already been commenced regarding this matter

Signed _____ Date 7/23/22.
Denise Venero

Witness  J. Cooke  #908  Date 7/23/22

224.    After she signed the paper, she gave it back to the cashier, and asked for a copy.

225.    The cashier told Denise to wait, and she had to go into the back and check whether the under duress portion was acceptable, because the cashier informed Denise that she was not supposed to write on the document except for her signature.

226.    The cashier returned and informed Denise that "it was okay" and handed Denise a copy of the "Breed Evaluation."

227.    Despite the Director of the Department of the Environment, informing Plaintiffs' counsel after the TRO hearing via email that check would be an acceptable form of payment, when Denise asked the cashier who the check should be made out to, the cashier informed her that they do not take checks.

228.    Denise informed the cashier that she had specific instructions to pay with a check or money order, and showed her the email from Director Andrea Crooms stating that check or money order was the preferred method.

229.    Again, the cashier had to go in the back and discuss this with someone, and returned a few minutes later to write down the email address of Director Andrea Crooms.

230.    The cashier then accepted the check, but did not provide a receipt to Denise.

231.    Denise asked the cashier if she could have a few minutes with the dogs in their fenced in area, so that they could go to the bathroom.

232.    The cashier stated that the dogs get walked and that they don't typically allow this.

233.    Denise had to inform the cashier that Defendant Cooke had informed her that animals under animal control custody do not get walked.

234.    The cashier said she would ask and went to the back again.

235.    However, before she came back, 3 staff members came out with Bella and Mimi.

236.    At no time during the pick-up of the dogs from Prince George's Animal Shelter did Plaintiff or her family members speak with or see, Defendant Cooke.

237.    When the staff brought out Bella and Mimi, the dogs were very happy to see Denise and the dogs gave them love and kisses.

238.     Denise's family members who came with her to P.G. Animal Shelter – her boyfriend and her parents.

239.     However, Prior to leaving the Prince George's Animal Shelter, Denise and the others family member who were with her, immediately noticed that both dogs had lost a noticeable amount of weight, particularly Mimi.

240.     They went outside the shelter and let the dogs play for a few minutes before heading to Towson Veterinary Hospital ("Pet Boarding Facility") in Baltimore County.

241.     During this time, they also noticed that Bella's and Mimi's barks also sounded hoarse and different than before.

242.     Two cars were brought to the facility to transport the dogs, so that each dog could have more room.

243.     They left the Prince George's Animal Shelter and Bella went with Denise's mom and dad, and Mimi rode with Denise and her boyfriend.

244.     During the car ride, Denise' boyfriend and herself noticed that Mimi sneezed at least once every minute during the entire ride.

245.     Shortly after 1:00 p.m., they arrived at the Pet Boarding Facility in Baltimore County, Maryland.

246.     Denise's parents informed Denise that Bella was shaking the entire one-hour car ride.

247.     Additionally, both dogs were out of breath in the 5 minutes it took them to walk from the cars to Pet Boarding Facility.

248.      Denise filled out the paperwork and left Bella and Mimi (with their food and toys).

249.     Denise and her family members felt uneasy after leaving Bella and Mimi at the boarding facility because they were very concerned about the dogs' conditions, however, they did not

want to deviate from the agreement that the dogs had to go directly from the Prince George's Animal Facility to the boarding facility out of the county.

250.    The condition of the dogs prompted Denise to call the staff at the Pet Boarding Facility to ask if Bella and Mimi could be evaluated by one of their vets.

251.    The person who answered the call was a veterinarian.

252.    When Denise explained the dogs' situation and the symptoms Bella and Mimi were having, the veterinarian on the telephone told Denise that the symptoms described were associated with Kennel cough.

253.    The veterinarian on the telephone was not happy with Denise, and Denise apologized for not having the dogs checked by a veterinarian immediately upon getting released from the PG Animal Shelter.

254.    The veterinarian at the Pet Boarding Facility informed Denise that the facility would now have to quarantine the section where Bella and Mimi were located.

255.    The veterinarian asked Denise whether the dogs could have Parvo, and Denise informed her that it could not be Parvo, because the County had declared, in federal court, that they didn't have an issue at the shelter.

256.    The veterinarian told Denise that the earliest the dogs could get into a veterinarian at their facility was on Monday, which was two days from the date they were placed in the Pet Boarding Facility.

257.    Denise knew the responsible thing was to get Bella and Mimi checked right away, so she started searching for emergency ER facilities that are open 24/7.

258.    She called approximately four places and they were at max capacity, and could not take any more emergency visits.

259.    They finally found Pet ER of Columbia that was not at max capacity, and called the boarding facility and told them they were coming to pick up the dogs.

260.    Denise and her father, drove back to Towson Veterinary Hospital to pick up the dogs and drove them to Pet ER of Columbia.

261.    When they picked the dogs up they noticed that now both Bella and Mimi were now sneezing.

262.    They arrived at the Pet ER at around 5:30 p.m. and waited outside for at least an hour to be seen.

263.    The dogs were finally seen in triage and were informed that Bella and Mimi's vitals were stable, and therefore the waiting period, for a stable dog to be seen by the ER vet was twelve hours.

264.    The veterinarian technician suggested that Denise schedule an appointment with her primary veterinarian first thing Monday morning on July 25, 2022.

265.    By the time the dogs were seen by the ER triage unit it was 7:00 p.m.

266.    The boarding facility would not take the dogs back due to the high probability the Bella and Mimi could infect others.

267.    Denise and her family had to quickly make arrangements to make sure the dogs had a home that Saturday night -  outside of Prince George's County.

268.    Denise's sister, Plaintiff Stephany, who lives in Howard County, is pregnant and they absolutely did not want to put her pregnancy at risk.

269.    They had to therefore improvise and in consultation with the attorneys, made arrangements with Denise's boyfriend's family to house the dogs in the boyfriend's parents' Anne Arundel County home.

270.    To accommodate Bella and Mimi, Denise's boyfriend's dogs Koi was taken to her house in Prince George's County house, so that she wouldn't be exposed to the highly contagious kennel cough that Bella and Mimi contracted at Prince George's Animals Facility.

271.    Denise shares the home with her parents, and the parents would be taking care of Denise's boyfriend's dog.

272.    Once arriving at Denise's boyfriend's house, because the dogs had not eaten all day, smelled really bad, and needed their long nails clipped – they took care of this immediately upon arriving there.

273.    The next day Sunday, July 24, 2022, Denise and her family members immediately began to call various Banfield pet hospitals all over the state, to see if they were able to see Bella and Mimi that day.

274.    Denise and Sophia have a wellness plan with Banfield.

275.    They had no success in finding any open appointments, and the best Banfield could do was to put them on a waiting list.

276.    Mimi had begun hacking, and they knew that they needed to get the dogs to the ER as soon as possible.

277.    Denise called several animal emergency clinics to inquire about their wait times, and found Bennet Creek Animal Hospital in Clarksburg, Maryland, in Montgomery County.

278.    They arrived at 12:56 p.m. and checked in.

279.    Given the dogs symptoms, they were asked to wait in their car and not go into the facility.

280.   It was 97 degrees already that day, and after 2 hours and 50 minutes of waiting in the car with the air condition running, they called and asked how much longer the wait would be because the air condition was not working very well at that point.

281.   The staff made arrangements to have them enter the side door, and they were placed into a room that was separated from the rest of the facility, and they waited another hour prior to being seen.

282.   The veterinarian who treated Bella and Mimi informed them that the dogs had symptoms of "infectious tracheobronchitis", also known as kennel cough.

283.   The veterinarian explained to them that even though Bella and Mimi had received vaccines for the major common causes of infectious tracheobronchitis, there are still other types that they could have contracted while staying in a shelter.

284.   They also told the veterinarian that Mimi was having soft stools, so he recommended a probiotic for her to take with the antibiotics he had prescribed.

285.   The vet also recommended that Bella and Mimi should be kept away from other dogs, and should not be returned to any kennel/boarding facility for at-a-minimum, seven days.

286.   After leaving the ER, the dogs were driven back to Denise's boyfriend's house, and fed and given their medications.

**VIII.   Plaintiff Denise Venero's boyfriend's dog is in danger of being seized**

287.   On July 28, 2022, Plaintiff's father was walking Denise's boyfriend's dog (Koi) near the house that Denise and her parents' live in, in Prince George's County.

288.   Koi is a Yorkie Terrier/Havanese/Bulldog.

289.    The neighbor whose dog was involved in the fight with Bella and Mimi, and his son were in their yard, and when they saw Plaintiffs' father walking Koi, the son yelled out "that's the dog."

290.    Plaintiffs now fear that Defendants will attempt to seize Denise's boyfriend's dog as well, based upon mistaken identity or because Defendants will claim the dog is a pit bull.

## IX.    FHA and Reasonable Accommodation

291.    On July 29, 2022, by and through counsel, Plaintiff Denise Venero submitted a reasonable accommodation request to the County, and attached her ESA documentation. (Exhibit G).

292.    In response the County attorney stated,

> I have received your letter and provided to my client. Unfortunately, the Director is out until Aug. 9. In reviewing the Code, I do not see any exceptions to the ordinance banning pit bull terriers other than for police dogs. If you are aware of any specific statutory authority to the DoE or the Animal Control Commission to grant such an exception, please send to me so that I can review and advise my clients.

293.    Plaintiffs' counsel responded with the authority requested, and informed the County that Plaintiffs would be amenable to reasonable conditions placed upon the dogs if they were allowed to return while the County considered the reasonable accommodation request.

294.    No response to such offer has been received from the County's Attorney

## X.    Prince George's Animal Cruelty Laws

295.    According to Prince George's County Ordinance Sec. Sec. 3-101. – Definitions,

> Cruelty shall mean any act of commission or omission whereby excessive psychological, emotional, physical harm, pain, suffering, or death is caused or permitted including providing for adequate shelter when the effective outdoor wind chill index is 32 degrees

> Fahrenheit or lower, or the heat index is 90 degrees Fahrenheit or higher, as determined by the National Weather Service. In the case of an activity in which physical pain is necessarily caused, such as food processing, hunting, experimentation, or pest elimination, cruelty shall mean the failure to employ the most reasonable humane method available under the circumstances.

296.   Ordinance Sec. 3-180(b)(3) - Animal Cruelty and Neglect; prohibited, defines serious

cruelty or neglect as,

> any act by an owner, custodian or other person which causes physical trauma, impairment of condition, and/or unnecessary pain and suffering and the cruelty or neglect results in physical injury to, and/or creates a substantial risk of death, or causes the death of an animal. A violation of this Section, as well as any third offense of less serious cruelty or neglect, shall result in a charge of cruelty, and the violator shall be subject to a fine of One Thousand Dollars ($1,000.00) and a fine of One Hundred Dollars ($100.00) per animal.

## XI.   July 27, 2022 Notice of Hearing

297.   On July 31, 2022, Denise Venero received in the mail, a Notice of Hearing dated July 27,

2022, which states that the Prince George's County Animal Services Division is requesting a

Dangerous dog Hearing."  (Exhibit B).

298.   The Notice is from Prince George's County Commission for Animal Control.

299.   The Notice requires Ms. Venero, under threat of arrest,[8] to appear for a Hearing on

August 10, 2022 at 1:00 p.m.

300.   Plaintiffs' attorneys have responded to this Notice of Hearing by Letter.  (Exhibit C &

D).  The response informs the Commission, (1) that Plaintiff Denise Venero does not waive any

constitutional rights and objects to the hearing; and (2) To the extent the Notice of Hearing sets

---

[8] Pursuant to Sec 3-115, if Denise Venero does not appear at this hearing she will be fined and/or imprisoned.  ("Any person failing to comply with an order issued by the Animal Control Commission shall be subject to a fine not to exceed One Thousand Dollars ($1,000.00) and/or imprisonment not to exceed ninety (90) days.")

forth a hearing procedure whereby Ms. Venero is being required to prove her case, and where she "shall give testimony," we decline this hearing based upon the Fifth Amendment.  Ms. Venero will not consent to a hearing that is jurisdictionally and constitutionally defective.  The letter to the Commission also asks for certain information from the Commission, (1) whether there will be a record of the proceedings, who is presiding over this hearing, who will be acting as the prosecutor, what the quantum of proof required is, and who bears the burden of proof and burden of persuasion, and direct us to where we can find the rules of evidence applicable to such hearing; (2) to provide Plaintiffs with the specific facts that meet the elements of this criminal offense; (3) to provide Plaintiffs with a Notice that sets forth the required notice provisions set forth in the County's own laws; (4) provide Plaintiffs with all the evidence (including reports, statements, recordings, etc.) related to the allegations against Denise Venero and Bella and Mimi; (5) and if this Hearing is proceeding under Ordinance Sec. 3-136(f) to provide Ms. Venero with a copy of this Complaint, and advise her as to whether there will be a record of the proceedings, who is presiding over this hearing, who will be acting as the prosecutor, who is the complainant, what the quantum of proof required is, who bears the burden of proof and burden of persuasion, and direct us to where we can find the rules of evidence applicable to such hearing.

301.    The Letter also objected to the Commission requiring Plaintiff Denise Venero to produce certain documents such as vaccine certificate, dog licenses, medical history.  The failure to provide these records to the Commission will result in a civil penalty.

302.    The Letter asked the Commission to provide Ms. Venero with the Ordinance or Rules which require these records to be produced to the Commission.

303.    The Notice of Hearing also requires Plaintiff Denise Venero to bring proof that Bella and Mimi are registered as "Pit Bulls".

304.    The letter explained to the Commission that the dogs have never been adjudicated to be "Pit Bulls".

305.    Therefore the demand that she produce documents that have no relevance to anything that the Commission is authorized to do, is improper and violates Ms. Venero's constitutional rights.

306.    The letter asked for the Commission to please provide the statutory, or other authority, upon which the demand for the "Pit Bull" registration is based upon.

307.    The letter also informed the Commission that to the extent that the County believes that a dog's breed has anything to do with the hearings, Ms. Venero has requested a reasonable accommodation under the FHA, and to date the County has not provided this reasonable accommodation, despite being formally requested to provide it.

308.    The Commission was informed that the FHA does not authorize the County to refuse accommodation based upon the breed of a dog, and that the County Ordinances do not preempt federal law.

309.    The letter informed the Commission that once a response is received from the Commission, Plaintiffs' attorneys suggest that prior to the scheduled hearing, a conference is scheduled so that the Commission and Plaintiffs' attorneys might discuss the issues and possible consequences of proceeding in the manner the Commission has chosen, and determine whether there may be a mutually acceptable manner to resolve the issues each side has without the necessity of resorting to further litigation.

310.    The Notice of Hearing changed the breeds of Bella and Mimi to "pit bull terrier mix" for both dogs, which is different that the July 11, 2022 Notice of Violation which stated that Mimi was mastiff mix and Bella a Labrador mix.

46

311.    The Notice of Hearing states that the date of incident was July 7, 2022, but according to

the Notice of Violation the incident occurred on July 4, 2022.

312.    On August 2, 2022, the County attorney responded to the Letter that Plaintiffs' attorneys

sent, in response to the Notice of Hearing,

> Received.  I expect the County will want to send a written response
> to your letter.  However, I will try to clear up a few things:
> 1.      The Aug. 10 proceeding is not a criminal proceeding; the
> Animal Control Commission does not have the authority to enforce
> criminal penalties
>     a. See the amended notice, which states the maximum fine for
>     each alleged violation
>     b. If your client chooses not to testify about certain matters
>     because of a perceived 5th Amendment issue, it is entirely her
>     choice to assert that right, however…
>   2.      Because this is an administrative proceeding, and not a
> criminal proceeding, the Respondent does not need to attend for the
> proceeding to go forward
>     a. Failure to attend would not constitute a failure to comply
>     with an order of the ACC because the ACC did not "order" her
>     to attend; they just issue a notice
>   3. It seems disingenuous for you to object to a hearing when your main
>     argument in the TRO was that you should have a hearing, and when
>     the agreement we reached during the TRO was that the hearing
>     would be on Aug. 10th *so that* all of the hearings could happen at
>     the same time.

313.    In response the County's attorneys email above, Plaintiffs' attorneys sent an email asking

for some clarification, and attached the July 31, 2022 Notice of Hearing,

> Attached is the July 31st Notice of Hearing that our client received.
> Is this the order you are referring to in paragraph 2a?  If it is not,
> please provide us with this Order.
>
> Additionally, in paragraph 1a you refer to an "amended notice". We
> do not have a copy of this. Can you please provide it to me?

314.    The County's attorney responded, "That is a summons, not an order."


**XII.    July 26, 2022 Amended Notice of Violation**

On July 26, 2022 Prince George's County, Department of the Environment, Animal Services

Division sent an "Amended Notice of Violation" to Denise Venero.  (Exhibit E).

315.    Her attorneys were emailed a copy of this Amended Notice earlier on August 2, 2022,

and Denise Venero received this notice via the USPS on August 2, 2022.

316.    This Amended Notice alleges violations of,

> Section 3—131(c) 'Manner of keeping animals — No person shall
> keep or maintain any animal in Prince George's County in such
> manner as to cause or permit animal to be a public nuisance' ($500
> fine per dog for first offense) ; Section 3—135 "Animals at Large
> Prohibited' ($50 fine per dog for first violation); Section 3—136
> 'Dangerous Animals' (designation; no fine); Section 3—142
> 'Irresponsible Pet Owner' ($500 for first violation); Section 3—182
> 'Potentially Dangerous Animals' (designation; no fine); 3—185.01
> 'Pit Bull Terriers — no person shall own, keep, or harbor a Pit Bull
> Terrier within the County" ($25 per dog for first offense)

317.    The Amended Notice also states,

> As you are aware, your hearing before the Commission is set for
> August 10, 2022. You have the right to appear before the
> Commission if you contest any of the above violations/designations.
> Alternatively, you can accept the violations and designations and
> waive this hearing by paying the full amount of the fines, $1,650.00.
> This payment must be made at the Animal Services Division at 3750
> Brown Station Rd, Upper Marlboro, Maryland, 20772. Payment can
> be in the form of cash or Credit Card.

## XIII.   Kennel Cough Continues to Plague the Dogs

318.    On July 31, 2022, as Plaintiff Denise Venero was getting ready for bed, Bella began

coughing and gagging, as if she was choking on something.

319.    Bella continued to cough and gag, so Plaintiff Denise Venero and her boyfriend gave her

water and tried calming her down, but she did not stop coughing and gagging.

320.    Plaintiff Denise Venero called Bennet Creek, the vet ER that they had taken both the dogs to previously, and the ER informed her it was for sure the kennel cough, and that they would probably need to start a new round of antibiotics.

321.    The ER assured Plaintiff Denise Venero that Bella was going to be okay, but that they should monitor her symptoms.

322.    Fortunately, Plaintiff Denise Venero had already scheduled an appointment with Banfield for the next day, August 1, 2022.

323.    Bella coughed periodically throughout the night, and in the morning on August 1, 2022, Bella coughed up white foam which was very concerning to Plaintiffs.

324.    Bella was also still having the coughing attacks.

325.    On August 1, 2022 the dogs were seen by Banfield in Columbia and again, the vets took precautions so that we wouldn't infect other dogs.

326.    The veterinarian said the dogs vitals were good, but that focal crackles could be heard in one of Bella's lungs.

327.    The Veterinarian explained that the antibiotics had worn off and that one treatment plan was to continue with one more week of antibiotics for Bella and that if they notice her symptoms getting worse, the Veterinarian will need to do a chest X-ray and look into pneumonia or conducting a PCR to see if the bacteria is resistant to the antibiotics.

328.    When we asked about Mimi needing more antibiotics, the veterinarian technician told them that because most likely they have the same strand, and because Mimi had responded well to the antibiotics, she did not need to take a second round.

329.    Plaintiff Denise Venero was told by Banfield that the dogs would need to continue to stay away from other dogs.

## CAUSES OF ACTION

## PIT BULL ORDINANCE AND ENFORCEMENT

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations
### "Pit Bull" Ordinance is Unconstitutionally Vague
### and Fails to Give Fair Notice of What is Prohibited
### (As to Plaintiffs individually and as Class Representatives)

330.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury

Demand as if fully set forth herein.

331.    The Ordinance is vague because it fails to provide sufficiently clear standards such that

persons of ordinary intelligence would be able to conform their conduct to the ban.

332.    Ordinance 3-185.01 describes prohibited animals by reference to breed standards written

for use by breed aficionados and thus deprives Plaintiffs' of fair warning of prohibited conduct

and is unconstitutionally vague and violates the Fourteenth Amendment.

333.    The description of a "Pit Bull" in Ordinance 3-101(D)), as dogs that "have the

appearance of being predominantly of the breed of dogs known as Staffordshire Bull Terrier,

American Staffordshire Terrier, or American Pit Bull Terrier[ ]" deprives Plaintiffs of fair

warning of prohibited conduct and is unconstitutionally vague and violates the Fourteenth

Amendment.

334.    Ordinance 3-101(D) fails defines "predominantly" as "the dog exhibits the physical

characteristics of a Pit Bull Terrier more than any other breed of dog."

335.    In order to enable the ordinary citizen to conform his or her conduct to the law, the "Pit

Bull" Ordinance must give fair notice of what conduct is prohibited,

336.    The Ordinances fail to provide any standard of conduct by which a person can determine

whether or not their dog is a "Pit Bull."

337. Defendants' enforcement of an ordinance that bans ownership of any dog that possesses "the physical characteristics of a Pit Bull Terrier more than any other breed of dog" deprives Plaintiffs' of fair warning of prohibited conduct and is unconstitutionally vague.

338. Defendants' failure to publicize the County's methodologies for determining whether a particular dog possesses "the physical characteristics of a Pit Bull Terrier more than any other breed of dog" deprives Plaintiffs of fair warning of prohibited conduct and is unconstitutionally vague.

339. The designation by Defendants of dogs as "pit bulls", and the manner in which to challenge the designation lacks any rules, standards, formal policies, or regulations.

340. The seizure and detention of animals that are designated as "Pit Bulls" by Defendants, lacks any rules, standards, policies, procedures or regulations.

341. There are no rules nor uniform standards for how a dog is designated as a "pit bull."

342. Defendants proceed upon designating a dog as a "Pit Bull" according to their own whims with no oversight or guidance of any sort, causing the retention and holding of dogs, by definition, to be arbitrary and capricious, and violative of the due process clause of the US Constitution.

343. The Ordinance is insufficiently definite because it encourages arbitrary enforcement with respect to non-registered pure breeds, that fall into the "[d]ogs which have the appearance of being predominantly of the breed of dogs known as Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier."

344. The Ordinance does not contain the required minimal guidelines to govern law enforcement.

345.    When a statute imposes criminal penalties, "the standard of certainty is higher and the statute can be invalidated on its face even where it could conceivably have some valid application."

346.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

347.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations**
**"Pit Bull" Ordinance is Unconstitutionally Vague**
**Ordinance is Standardless and encourages and authorizes seriously discriminatory enforcement**
**(As to Plaintiffs individually and as Class Representatives)**

348.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

349.    Ordinance 3-101(D) is unconstitutionally vague under the Due Process Clause because it is so standardless that it authorizes or encourages seriously discriminatory enforcement.

350.    Ordinance 3-101(D) defines "predominantly" as "the dog exhibits the physical characteristics of a Pit Bull Terrier more than any other breed of dog."

351.    Ordinance 3-185.01 describes prohibited animals by reference to breed standards written for use by breed aficionados and thus deprives Plaintiffs' of fair warning of prohibited conduct and is unconstitutionally vague and violates the Fourteenth Amendment.

352.    The description of a "Pit Bull" in Ordinance 3-101(D)), as dogs that "have the appearance of being predominantly of the breed of dogs known as Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier[ ]" is so standardless that it authorizes or encourages seriously discriminatory enforcement, and thus is unconstitutionally vague and violates the Fourteenth Amendment.

353.    Ordinance Sec. 3-185.01 is a penal statute.  See Sec. 3-116.01. - Criminal penalties; violations. "(a) Any person found to have violated any provision of Section 3-185.01 shall be fined up to $1,000.00 or may be sentenced to not more than six (6) months of imprisonment[;] and "(b) A Pit Bull that causes injury to or kills a human being or a domestic animal without provocation shall be humanely destroyed, and the owner of such dog shall be fined up to $1,000.00 or may be sentenced to not more than six (6) months of imprisonment.

354.    The Ordinances pertaining to "Pit Bulls" do not define the criminal offense in a manner that does not encourage arbitrary and discriminatory enforcement.

355.    The Ordinances do not adequately curtail arbitrary enforcement.

356.    Defendants proceed upon impoundment according to their own whims with no oversight or guidance of any sort, causing the retention and holding of dogs, by definition, to be arbitrary and capricious, and violative of both the due process clause

357.    The Ordinances are unconstitutional because there are no written rules, policies, procedures, guidelines, practices or regulations regarding Defendants' designation of dogs as "Pit Bulls."

358.    The Ordinances are unconstitutional because there are no written rules, policies, procedures, guidelines, practices or regulations regarding the process by which Defendants' designate dogs as "Pit Bulls."

359.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

360.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection**
**"Pit Bull" Ordinance**
**Lack of Rational Relationship**
**(As to Plaintiffs individually and as Class Representatives)**

361.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

362.    The purpose of the pit bull Ordinance 3-185.01 is, allegedly, to protect the community from breeds which Defendants believe are inherently more dangerous than the average dog, and therefore their position is that banning them is in interest of public safety and is rationally related to a legitimate governmental interest.

363.    It is uncontested that Defendant Prince George's County has a legitimate interest in animal control--the protection of health and safety of the public.

364.    The means by which Defendants has chosen to pursue that interest are irrational and lacks any basis in scientific fact.

365.    Defendants do not care whether the dog is in actuality a "pit bull."

366.    As represented at the TRO Hearing by Defendant Cooke, the DNA of a dog is not of interest to them and is not used nor will it be considered in determining whether a dog is subject to the designation under the ordinance, but rather it is their perception of whether the dog is a "pit bull."

367.    That statement and the manner of enforcement shows that the Pit Bull Ordinance has no rational relationship to the protection of health and safety of the public.

368.    If the breed of the dog makes it more prone to attack than other breed of dogs, in order to abate the concern, the County must enforce the ban as against dogs of the breed so alleged to cause attacks.

369.    The characteristics associated with the breed of a dog are rooted in the dog's DNA which is subject to, and can only be determined by scientific inquiry.

370.    Because Defendants are not interested in knowing whether any particular dog they have designated as a "pit bull" in actuality has the DNA of the dogs defined by Defendant as being a "pit bull".

371.    For the purpose of this cause of action, Plaintiffs are not challenging whether the Ordinance is the best means to achieve the particular purpose, but rather, when the method of enforcement has no relationship, and in fact denies the very basis upon which the ordinance is predicated – the entire procedure becomes unconditional.

372.    The manner of enforcement belies that the purpose of the ordinance to protect the health and safety of the community from pit bull dogs and is irrational.

373.    The means by which Defendants have chosen to pursue the interest is irrational.

374.    The enforcement of the Ordinance ignores whether the dog is in actuality a "pit bull."

375.    There is no rational relationship between the manner in which the Ordinance is enforced and the stated purpose for which the Ordinance was enacted.

376.    This classification bears no rational relationship to the purpose of the statute and therefore violates the Equal Protection clause of the Fourteenth Amendment.

377.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

378.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations**
**"Pit Bull" Ordinance**
**Impermissibly Overbroad**
**(As to Plaintiffs individually and as Class Representatives)**

379.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

380.    Ordinance Sec. 3-101(D) suffers from impermissible overbreadth.

381.    As to the dogs Defendants designate as "Pit Bulls" based upon their appearance being predominantly of the breeds known as Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier[,]" the Ordinance is overbroad because it includes dogs that scientifically (DNA) are not predominantly of the three breeds.

382.    As to the dogs that Defendant determines are not "Pit Bulls", because the scientific evidence (DNA) is ignored and not part of the designation methodology, dogs that are in-fact predominantly of the three breeds, are able to reside in Prince George's County.

383.     Thus, the Ordinance bans dogs designated as "Pit Bulls" that are in-fact not made up predominantly of the three breeds,[9] while at the same time fails to designate dogs that are scientifically predominantly of the three breeds.

384.     The Ordinance is impermissibly overbroad because a substantial number of its applications are unconstitutional, in relation to the statute's plainly legitimate sweep.

385.     The Ordinance is being applied unconstitutionally, because the effect of the overbreadth is that persons are deprived of their property interest – their dogs.

386.     Defendants do not care whether the dog is in actuality a "pit bull."

387.     Defendants do not care that dogs running around Prince George's County are in fact predominantly of the three banned breeds.

388.     The Ordinance is invalid on its face.

389.     In order to avoid being repetitive Plaintiffs incorporate the Second Cause of Action, ¶¶ 358-366.

390.     Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

391.     As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.


**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Fourth Amendment - Unreasonable Seizure**
**Facially Unconstitutional Ordinance**
**Impoundment and Detention**
**(As to Plaintiffs individually and as Class Representatives)**

---

[9] Staffordshire Bull Terrier, American Staffordshire Terrier, or American Pit Bull Terrier

392.     Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

393.     Plaintiffs have a right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.

394.     Having no specific statutory authority to do so, defendants impound, detain, and bar dogs from residing in Prince George's County, during which time Defendants have not provided plaintiffs an opportunity to contest the designation of Plaintiff's dogs as "pit bulls".

395.     The impounding and retention, and continued out-of-county restriction, without the ability to contest, is an unreasonable seizure.

396.     Defendants' unwritten policy and practice of summarily seizing and detaining dogs that Defendants claim are pit bulls, is not authorized by the ordinance and is an unreasonable seizure.

397.     The impoundment and detention of dogs designated by Defendants as being "Pit Bulls" is an unconstitutional policy is an unreasonable seizure that violates the Fourth Amendment.

398.     Prince George's Ordinances do not authorize Defendants to impound and detain Plaintiffs' dogs because they are "Pit Bulls."

399.     Defendants lacked probable cause to effectuate the warrantless seizures of their dogs under the 4th Amendment to the US Constitution+.

400.     Defendants' actions are unconstitutional because plaintiffs have also been deprived of visitation with their dogs, and of providing their choice of care, food, medical attention, exercise and other indicia of ownership to their dogs.

401.     Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

402.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

### SIXTH CAUSE OF ACTION
**42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations**
**"Pit Bull" Ordinance Fails *Mathews* test**
**and is thus Facially Unconstitutional**
**(As to Plaintiffs individually and as Class Representatives)**

403.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

404.    Ordinance 3-185.01 deprives Plaintiffs, because the Ordinance fails to comport with the due process mandates of notice, and a reasonable opportunity to contest the seizure in a meaningful time and manner.

405.    Neither the "Pit Bull" Ordinance 3-185.01, nor any other Ordinance of Defendant Prince George's County, contains any procedures of notice or a hearing prior to or after the designation of the dog as being a "Pit Bull."

406.    The lack of affording animal owners with a prompt post-seizure hearing to contest the "pit bull" designation is a facially unconstitutional policy.

407.    The lack of affording dog owners of a manner and means by which to contest the designation of their dogs as "pit bulls" is a facially unconstitutional policy.

408.    Neither the Ordinances nor Defendants' Breed Evaluation informs a person of reasonable intelligence as to how to challenge the impoundment of the seized animals and the Defendants' determination that the dog is a "pit bull".

409.    Defendants' unwritten policy and practice of summarily impounding and detaining dogs whom Defendants claim are pit bulls, without providing notice and an opportunity to be heard is not authorized by the ordinance and violates Plaintiffs' right to due process.

410.    Defendants actions are unconstitutional because the named plaintiffs, whose dogs have been seized and retained, have never been afforded an opportunity to be heard at a meaningful time and in a meaningful manner at which to contest the validity of the seizure of their dogs and the dogs' continued retention.

411.    Defendants actions are unconstitutional because the named plaintiffs, whose dogs have been designated as "pit bulls", have never been afforded an opportunity to be heard at a meaningful time and in a meaningful manner at which to contest this designation.

412.    Defendants' actions have prevented and failed to provide, Plaintiffs with timely notice and an opportunity for a hearing or any other review of the decision to seize and retain, such that plaintiffs' deprivation of their property, their dogs, without process, has occurred and continues to occur, thus violating plaintiffs' rights under the 14th Amendment.

413.    Defendants' actions have prevented and failed to provide, Plaintiffs with timely notice and an opportunity for a hearing or any other review of the decision to designate their dogs as "pit bulls", such that plaintiffs' deprivation of their property, their dogs, without process, has occurred and continues to occur, thus violating plaintiffs' rights under the 14th Amendment.

414.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

415.     As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations**
**Breed Evaluation violates Due Process**
**and is thus Facially Unconstitutional**
**(As to Plaintiffs individually and as Class Representatives)**

416.     Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

417.     The "Breed Evaluation" document which Plaintiff Denise Venero was required to sign prior to Defendants' releasing Bella and Mimi to her, is facially unconstitutional.

418.     The document which was signed by Plaintiff Denis Venero and Defendant J. Cooke states that the dogs must be immediately removed from Prince George's County and failure to comply will result in legal action and the dogs will be impounded.

419.     The Breed Evaluation is facially unconstitutional because it fails to give notice of the right to contest the designation of the dog as a "pit bull", fails to inform Plaintiffs how they can contest the designation, and be heard on the designation, and the threatened impoundment.

420.     Notice and an opportunity to be heard is the cornerstone of due process.

421.     The Breed Evaluation lacks the basic minimum standards of due process and is thus facially invalid and unconstitutional.

422.     The Breed Evaluation , also fails to satisfy due process because Defendants failed to provide written notice of the possible criminal penalties Plaintiffs face for the alleged violations set forth in the Breed Evaluation.

423.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

424.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

### EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process Violations
### Substantive Due Process
### Fundamental Right
### (As to Plaintiffs individually and as Class Representatives)

425.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

426.    The Ordinance deprives Plaintiffs of substantive due process.

427.    The enforcement of the Ordinance burdens a fundamental right.

428.    The human/companion animal bond is a fundamental liberty interest, and because the Ordinance is not narrowly tailored to serve a compelling government interest, it imposes an unconstitutional burden on this fundamental right.

429.    The Ordinance is an arbitrary legislation because there lacks a relationship between enforcement of the Ordinance and the government interest it seeks to advance.

430.    And because the infringement is not narrowly tailored to serve a compelling government interest, the Ordinance violates due process.

431.    In order to avoid being repetitive Plaintiffs incorporate paragraphs 371 to 385 set forth in the Sixth Cause of Action above,.

432.     Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

433.     As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**NINTH CAUSE OF ACTION**
**42 U.S.C.S. § 3601 et seq. of the Fair Housing Act**
**Disparate Impact**
**(As to Plaintiffs individually and as Class Representatives)**

434.     Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

435.     Defendants have violated the Fair Housing Act, because of the disparate impact of its impounding, detaining, and designating dogs as "Pit Bulls" on the protected class.

436.     Prince George's County's breed-specific Ordinance has a discriminatory effect upon Plaintiffs and the class.

437.     Plaintiffs have been forced to be without their dogs for a significant period of time.

438.     The class members have been forced to give up their pets.

439.     Some class members had to move out of Prince George's county because of the Ordinance.

440.     The "Pit Bull" ban has a substantially greater adverse impact on minorities due to the population make-up of Prince George's County, with 84.5 percent of the population in a minority class of Hispanics and African Americans.

441.    There are other means of serving Prince George's County's safety interest, by requiring muzzling, higher fences, behavioral assessment, mandatory sterilization of male dogs, harsher penalties for coaching animals to fight, stricter confinement regulations or leash laws or other regulations, that could adequately mitigate the claimed risk.

442.    All of the above options could be used while still protecting the public would be more sensitive to minority classes than a flat out prohibition based on breed.

443.    Defendants enforcement of the "Pit Bull" Ordinance violates the FHA by permitting a discriminatory housing practice.

444.    There are alternatives to breed-specific legislation exist that would serve the Prince George's County's public safety interests while lessening the discriminatory effect.

445.    Defendants do not have a substantial, legitimate and nondiscriminatory interest" for the "Pit Bull" ban, and reasonable alternatives do exist.

446.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

447.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.


**TENTH CAUSE OF ACTION**
**42 U.S.C. § 3604 of the Fair Housing Act**
**Failure to Accommodate**
**(As to Plaintiffs individually and as Class Representatives)**

448.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

449.    Defendants have violated the Fair Housing Act because they have denied Plaintiff Denise Venero reasonable accommodation based upon her disability.

450.    The failure to accommodate a person who possesses an ESA, based upon the "Pit Bull" ban, constitutes discrimination against a person in violation of the FHA - 42 U.S.C. § 3604(f)(2), (f)(3)(b) - by discriminating on the basis of handicap in connection with such dwelling.

451.    Defendants, through their conduct and acts described, violated 42 U.S.C. § 3604(f), by refusing to make reasonable accommodation in its rules, policies, practices, or services, when such accommodations are necessary to afford Plaintiff, and the class, an equal opportunity to use and enjoy their dwellings.

452.    Providing an accommodation to Plaintiff, and the class members, so that they may live in Prince George's County with an emotional support dog, would not (1) result in substantial physical damage to the property of others; (2) pose an undue financial and administrative burden; or (3) fundamentally alter the nature of Prince George's County's operations.

453.    Defendants have informed Plaintiffs that there are no set of circumstances, other than if the dog is a police dog, in which a disabled person can receive reasonable accommodation for an ESA dog that Defendants have designated as a "Pit Bull".

454.    Defendant has failed to make a "reasonable accommodation" under Section 3604 of the FHA.  *See* 42 U.S.C. § 3604(f)(3)(B).

455.    The accommodation Plaintiff requested does not impose an undue financial and administrative burden on the Defendants, nor does it fundamentally alter the nature of Prince George's County's operations.

456.    The "Pit Bull" ban does not trump the FHA.

457.    When applied to emotional support dogs, any law that contradicts the FHA has been

preempted and is unenforceable.

458.    Section 3615 of the FHA provides:

> Nothing in this subchapter shall be construed to invalidate or limit
> any law of a State or political subdivision of a State, or of any other
> jurisdiction in which this subchapter shall be effective, that grants,
> guarantees, or protects the same rights as are granted by this
> subchapter; but any law of a state, a political subdivision, or other
> such jurisdiction that purports to require or permit any action that
> would be a discriminatory housing practice under this subchapter
> shall to that extent be invalid.

459.    Prince George's County has declared that there is no exception to the "Pit Bull"

Ordinance, even as to a request for reasonable accommodation.

460.    The law is void as a matter of law as to reasonable accommodation under the FHA, or

Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act (§ 504).

461.    If the dogs are verified as an emotional support animal, Federal Law requires

accommodations must be made, regardless of breed or size.

462.    Defendants are discriminating against persons with disabilities by failing to provide

reasonable accommodations in violation of the Fair Housing Act.

463.    As a direct and proximate cause and consequence of Defendants' unlawful conduct as

described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are

entitled to declaratory and injunctive relief.

**ELEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation - Equal Protection**
**Invidious Discrimination**
**(As to Plaintiffs individually and as Class Representatives)**

464.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury

Demand as if fully set forth herein.

465.    Defendant Prince George's County's "Pit Bull" ordinance bears no rational relationship

to the purpose of the statute and therefore violates the Equal Protection clause of the Fourteenth

Amendment.

466.    The object sought to be obtained to be attained is presumably for the health and safety of

the public.

467.    The classification adopted in the Ordinance 3-101(D) defining a "Pit Bull" as,

> [d]ogs which have the appearance of being predominantly of the
> breed of dogs known as Staffordshire Bull Terrier, American
> Staffordshire Terrier, or American Pit Bull Terrier. Predominantly
> shall mean that the dog exhibits the physical characteristics of a Pit
> Bull Terrier more than any other breed of dog[,]

fails to meet the objective because Defendants do not care whether the dog is in actuality a "pit

bull."

468.    During the TRO Hearing held before this Court on July 15, 2022, Defendant ACO Cooke

informed the Court and the parties, that a DNA test is irrelevant to Defendants' designation of

the dog as a "pit bull."

469.    In theory, a ban on all dogs would serve the government's safety interest more effectively

than the current ban, because dogs that are actually "Pit Bulls" are not being designated as such

because of the manner by which Defendants designate a dog as a "Pit Bull."

470.    If the process of determining whether a dog is a "Pit Bull" is based upon a system which

eliminates scientific evidence that would show whether or not the dog is in actuality a "Pit Bull",

there can be no rational relationship between the purpose of the Ordinance, that being to protect

the health and safety of the public, and the classification set forth in the Ordinance.

471.    The Ordinance and the enforcement of the Ordinance violates Plaintiffs' right to equal

protection because the statute bears no rational relationship to the government's goal of

protecting the public from "pit bulls".

472.    Because the Ordinance classification is not rationally related to the purpose of the

Ordinance, it constitutes an invidious discrimination against minorities who resided in Prince

George's County.

473.    "Strong cultural ties exist between pit bull dogs and the Black community. The same is

true of the Latino community."  Ann Linder, *The Black Man's Dog: The Social Context of Breed*

*Specific Legislation*, 25 Animal Law 51 (2018).

## NON PIT BULL CAUSES OF ACTION

### TWELFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 Fourteenth Amendment
### Procedural Due Process
### (As to Plaintiffs individually and as Class Representatives)

474.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury

Demand as if fully set forth herein.

475.    The Notice of Violation served upon Plaintiffs violates due process because the penalty

for each alleged violation is not contained within the Notice.

476.    The Notice of Violation served upon Plaintiffs violates due process because if fails to

inform Plaintiffs that they have the option, in lieu of requesting a hearing before the

Commission, to pay Prince George's County a pay civil penalties.

477.    The Notice of Violation is defective on its face for failing to provide notice and an

opportunity to be heard in a meaningful time and manner because of the omission of critical

information which would enable Plaintiffs to obtain due process.

478.   Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

479.   As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**THIRTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourth Amendment Violation**
**(As to Plaintiffs individually and as Class Representatives)**

480.   Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

481.   Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

482.   Defendants unlawfully and unconstitutionally seized Plaintiffs' personalty, to wit, Bella and Mimi, in violation of the Fourth Amendment to the United States Constitution.

483.   Dogs are property and for 4th Amendment purposes, dogs are considered effects and therefore entitled to protection.

484.   A seizure of Plaintiffs' dogs occurred and upon Defendants taking possession of the dogs, they were told they would not get their dogs back, and were prevented from obtaining any due process to challenge the impoundment and continued retention of the dogs.

485.   A continued retention of plaintiffs' property, their dog, after the 48 hour and 72 hour notice time lapsed, is a warrantless seizure.

486.    Plaintiffs have been deprived of visitation with their dogs, and of being able to provide their choice of care, food, medical attention, exercise and other indicia of ownership to their dogs.

487.    The seizure of plaintiffs' dogs is unreasonable because there exists no explicit statutory authority to hold the dog when Defendants failed to provide an opportunity for an impoundment hearing and a post-seizure hearing.

488.    The seizure of plaintiffs' dogs is unreasonable because there exists no explicit statutory authority to hold the dog Defendants have determined to be "pit bulls".

489.    The seizure is unreasonable because there are no rules, guidelines, procedures, policies, regulations or uniform standards concerning when it is permissible to retain plaintiffs' dogs.

490.    The seizure is unreasonable because the persons who made the determination that Plaintiffs' dogs are "pit bulls" have no required specific training or specialized knowledge to enable them to make a determination to detain the dog.

491.    The retention of the dogs is unreasonable because there is no ability to contest it, and in fact Plaintiffs were actively prevented from obtaining a hearing either on the designation of the dogs as dangerous and on the continued retention of their dogs.

492.    The seizure is unreasonable because there is no uniform method of assessing whether a dog is a "pit bull" or not, and therefore no standardized process, rules, procedures or policies exist to make a determination to detain the dog indefinitely.

493.    The seizure is unreasonable because the length of the seizure and retention is not brief or for a predetermined length of time, and lasts for a minimum of 6-8 months and possibly permanently.  It is expected that most class members were permanently deprived of their dogs in the early stages after the seizure, as a result of the scheme perpetrated by Defendants.

494. The seizure is unreasonable because of the absence of any rules, guidelines, procedures, policies, regulations or uniform standards to limit the unfettered discretion of the individual defendants, and the lack of any review process or means to challenge the propriety of the seizure and retention of plaintiffs' dogs.

495. By seizing plaintiffs' dogs and retaining possession of such dogs indefinitely, and without providing plaintiffs with the necessary due process, including an opportunity to contest the validity of the seizure and retention, defendants violated plaintiffs' rights under the Fourth Amendment to the U.S. Constitution.

496. Defendants' impoundment and retention scheme is unconstitutional because it permits seizures and impoundments of property, while at the same time vesting ultimate discretion and authority in the Defendants to seize plaintiffs' property, with no rules or procedures that must be followed.

497. Although the named Plaintiffs were told they could Appeal the decision to not return their dogs, a bond must be paid before being allowed to appeal a decision that Plaintiffs have not been provided any basis for or justification, without having been given any process, as required by the Ordinance, and without the ability to adequately refute the evidence purportedly forming the basis of the decision. No reasons were given for the decision not to return the dogs. There are no procedures as to who makes the decision to not return the dogs, there is no statute which provides any information on who makes that decision, and based upon what evidence. Nor were the Plaintiffs allowed to see the purported evidence or refute it. Moreover, the appeal would be an exercise in futility as the Commission has not held a hearing since February 22, 2022 and the holding of Plaintiffs' dogs is a permanent deprivation and constitutes an unreasonable seizure.

498. Defendants' actions were taken under color of law, violating clearly established rights,

of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them.

499.     As a direct and proximate cause and consequence of Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

**FOURTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourth Amendment Violation**
**Free from Unreasonable Seizures**
**(As to Plaintiffs individually and as Class Representatives)**

500.     Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

501.     By seizing plaintiffs' animals and intentionally maintaining such animals under such conditions, when the animals have not been adjudged dangerous or vicious and are being held merely for safekeeping until a determination of same can be made, Defendants have violated Plaintiffs' rights pursuant to the Fourth Amendment of the U.S. Constitution.

502.     Because of the injuries inflicted upon plaintiffs' property, their animals, the defendants' conduct is a per se violation of the plaintiffs' Fourth Amendment rights to be free of *unreasonable* seizures.

503.     By holding plaintiffs' animal property and providing less than the legal minimum standard of care owed to plaintiffs, including the continual failure to provide good wholesome air, food, sufficient shelter and sustenance, Defendants have deprived and will continue to deprive plaintiffs and all members of the plaintiff class of rights guaranteed by the Fourth Amendment of the United States Constitution.

504.     In order for the seizure to be reasonable pursuant to the Fourth Amendment, Plaintiffs have a right to have their property treated in a way such that said property does not debilitate or is otherwise knowingly or intentionally damaged during the time it is being held.

505.     Defendant Prince George County has an obligation and non-delegable duty to supervise the Animal Facility to ensure that it maintains care for all seized and held animals with a level of care consistent with the minimum standards required by state law.

506.     Failure to provide minimum levels of care required by law, which causes injury to plaintiffs' property, is unreasonable and thus violates plaintiffs' Fourth Amendment rights as to their property.

507.     Plaintiffs have suffered injury in that their property has been damaged by reason of Defendants' violations of Plaintiff's Fourth Amendment rights, and Plaintiffs have been and will be required to incur significant costs and expenses attributable to illnesses and diseases resulting from the breach of Defendants' non-delegable duty to provide reasonable care to Plaintiffs' property that they have impounded.

508.     Alternatively, by failing to supervise the Animal Facilities' operations, the official policy of Prince George County has been that animals enter the shelter clean and leave sick. This policy constitutes a breach of Prince George's County's obligation and non-delegable duty to maintain property impounded from plaintiffs.

509.     Alternatively, Defendants' actions were deliberate, reckless and indifferent to Plaintiffs' constitutional rights. Plaintiffs have suffered, and/or are currently suffering, immediate and irreparable harm due to the actions of defendants, and will continue to suffer such harm.

510.     This injury is not a form of compensation for personal injuries suffered by dogs, and it is not a derivative injury of the harm caused to dogs. It is separate economic injury directly to the

property of plaintiffs, and is wholly distinct from the harms suffered by individuals. The plaintiffs suffered this economic injury from Defendants' violation of Plaintiff's Fourth Amendment rights because the plaintiffs' property was damaged and plaintiffs were and/or will be obligated to incur expenses for the veterinary and rehabilitative costs to repair such injuries.

511.    Having deliberately violated the Plaintiffs' constitutionally protected rights, and concomitantly having caused the plaintiff to sustain damages as a result thereof, Defendants are liable to the Plaintiffs, and the Plaintiffs are entitled to recover the amount of damages sustained, declaratory, and injunctive relief, the costs of bringing this suit and reasonable attorneys' fees against Defendants pursuant to 28 U.S.C. Sections 2201 and 2202, and 42 U.S.C. Section 1983.

**FIFTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Monell**
**(As to Plaintiffs individually and as Class Representatives)**

512.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

513.    Defendants have violated Plaintiffs' constitutional rights based on policy and custom as stated above, and defective training, pursuant to the doctrines set forth in *Monell v Dept. of Soc. Serv.,* 436 U.S. 658 (1978) and progeny, as the moving force behind the constitutional injuries stated in the preceding causes of action.

514.    Defendants' actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by them. As a direct and proximate cause and consequence of

515.    Defendants' unlawful conduct as described above, Plaintiffs have suffered injuries in an amount to be proven at trial and are entitled to declaratory and injunctive relief.

## SIXTEENTH CAUSE OF ACTION
### PETITION FOR ADMINISTRATIVE MANDAMUS
### Maryland Rule 7-401 through 7-403
### (As to Plaintiffs individually and as Class Representatives)

516.    Plaintiffs incorporate by reference all other paragraphs of this Complaint and Jury Demand as if fully set forth herein.

517.    This Writ of Administrative Mandamus seeks preliminary and permanent injunctive relief barring Prince George's County holding hearings on 3-136 "Dangerous Animals" because there is no remedy in the administrative proceedings whereby Plaintiff can contest the fact that the allegations set forth in both the Notice of Violation and the Amended Notice do not satisfy the elements of the offense, which requires a dog to have inflicted injury on a human, or to have killed an animal, or to have been previously found to be potentially dangerous because of injury inflicted on a human or an animal.  The Violation alleged is not supported by competent, material or substantial evidence in light of the entire record.

518.    In Maryland, a motion to dismiss in the Circuit Court is governed by *Maryland Rule 4-252*.  Section (d) of the Rule provides that **"**[a] motion asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time.  Any other defense, objection, or request capable of determination before trial without trial of the general issue, shall be raised by motion filed at any time before trial."

519.    The Prince George's County, Maryland Commission for Animal Control has "officially summoned" Plaintiff Denise Venero before it on August 10, 2022.  The purpose of the hearing is to designate Bella and Mimi as dangerous dogs.  The Notice requires Ms. Venero, under threat of arrest,[10] to appear for the Hearing.

---

[10] Pursuant to Sec 3-115, if Denise Venero does not appear at this hearing she will be fined

520.    Because Defendants have no mechanisms by which to contest the failure of the Defendants to allege facts which meet the elements of a dangerous dog violation in advance of a hearing, this challenge is ripe for an administrative mandamus.

521.    There is no authority for the Commission to "summon" Plaintiff Denise Venero to a Dangerous Dog hearing.

522.    Plaintiff Denise Venero has a protected interest in her property – her dogs Bella and Mimi.

523.    Plaintiff Denise Venero has a clear legal right to not be hauled into a hearing under threat of arrest, especially in light of the fact that no Ordinance authorizes this, and the County's attorneys have represented that the hearing is "not a criminal proceeding."

524.    Plaintiff Denise Venero has a right to redress of the dangerous dog designation in advance of any hearing, and the Ordinances do not provide for an administrative remedy to challenge the Commissions' ordering of her to attend the hearing, and to challenge the failure to allege facts which meet the elements of the offense.  Thus exhaustion of the administrative remedy is not required, because no remedy exists.

525.    This Writ of Administrative Mandamus seeks preliminary and permanent injunctive relief barring Prince George's County holding hearings on their designating dogs as "Pit Bulls" pursuant to Ordinance Sec. 185.01 'Pit Bull Terriers, because Prince George's County Ordinances do not provide for such a hearing.

526.    The holding of a hearing on the designation of a dog as a "Pit Bull" exceeds the statutory authority and jurisdiction of the Commission.

---

and/or imprisoned.  ("Any person failing to comply with an order issued by the Animal Control Commission shall be subject to a fine not to exceed One Thousand Dollars ($1,000.00) and/or imprisonment not to exceed ninety (90) days.")

527.    Plaintiff has no remedy by which to contest the designation of the dogs as "Pit Bulls" other than to abide by a procedure, which is not authorized by the Ordinance, upon a Summons which forces her to attend a hearing under threat of arrest, with no Ordinance, rules or regulations setting forth the methodology of the designation, and the process of the hearing.

528.    The Commission cannot pick and choose what violations it desires to consider without a basis that provides this authority.  In other words there is no enabling statutes which gives the Commission authority to conduct a hearing on the designation of a dog when the facts do not meet the elements of an offense.  And there is no enabling statutes which gives the Commission authority to conduct a hearing on a "Pit Bull" designation.

529.    The charging document fails to show jurisdiction in the Commission and fails to charge an offense on its face.

530.    For these reasons, Plaintiffs request a Writ of Mandamus be issued barring Defendants from holding a hearing on the dangerous dog designation and on the "Pit Bull" designation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

A.  Accept jurisdiction over this action;

B.  Declare that the practices of Defendants as set forth above, are discriminatory and violate the Fair Housing Act;

C.   Enjoin Defendants from discriminating against any person based upon handicap by refusing to make a reasonable accommodation when such accommodation may be necessary to afford a person with a handicap an equal right to enjoy living in Prince George's County;

D.  Enjoin Defendants from enforcing Ordinance 3-185.01 until Defendants have in place acceptable objective policies and procedures that permit a person with a disability to obtain an accommodation;

E.  Order Defendants to grant Plaintiff Denise Venero's requested accommodation;

F.  For Declaratory Judgment (28 U.S.C. §§ 2201-2202, 42 U.S.C. § 1983) as follows,

   a.  finding that 3-185.01 titled "Pit Bull Terriers " unconstitutional facially and as applied under the Fourth and Fourteenth Amendments to the United States Constitution (seizure, procedural due process deprivation of liberty and property; substantive due process deprivation; vagueness; overbreadth; and equal protection), with respect to both mixed-breed and purebred dogs;

   b.  finding County Ordinance 3-185.01 unconstitutional under the Fourteenth Amendment for failing to provide any opportunity to be heard upon a unilateral, permanent designation of a dog as a "Pit Bull";

   c.  Finding the actions of Defendants unconstitutional under the Fourth and Fourteenth Amendment for failing to provide a pre-seizure hearing where there are not exigent circumstances, otherwise failing to provide a prompt post-seizure hearing;

   d.  Finding the actions of Defendants in failing to provide notice and an impoundment hearing as required by Ordinance 3-136 to be unconstitutional;

   e.  Finding that Plaintiffs are entitled to a minimum standard of care from Defendants regarding their animal property that was seized and impounded by Defendants;

   f.  Finding that Defendants' actions were willful and wanton and in reckless disregard of Plaintiffs' civil rights under law;

G.  Injunctive relief under 28 U.S.C. §§ 2201-2202, 42 U.S.C. § 1983 as follows,

    a.  Order Defendants to release to their owners those dogs seized and held for disposal, unless an impoundment hearing and a post-seizure hearing is promptly held;

    b.  Enjoin defendants from seizing and detaining any dog under Ordinance Sec. 3-185.01 without first giving the owner a prompt pre-seizure pre-judgment hearing before a neutral judicial or administrative officer;

    c.  Enjoin the County from enforcing and enacting breed-specific prohibitions, for violating the Fourth and Fourteenth Amendments of the United States Constitution, and to mandate that the County provide a meaningful opportunity to contest the unilateral, permanent determination that a dog is a "Pit Bull";

    d.  Enjoin the Defendant from seizing and detaining animals under Section 3-136 (Dangerous Dog Ordinance), until they provide the notice and a hearing as required by Ordinance 3-136;

    e.  Enjoin Defendants from retaining possession of impounded dogs unless and until they provide a prompt post seizure pre-judgment hearing before a neutral judicial or administrative officer;

    f.  Enjoin Defendants from intentionally holding dogs in conditions intended to permit disease and injury in violation of Plaintiffs' Fourth Amendment rights;

    g.  Enjoin Defendants from refusing to release dogs whose owners qualify for a reasonable accommodation based upon the dog being an ESA.

    h.   Enjoin Defendants from refusing to reasonably accommodate a disabled persons request vis-à-vis their ESA;

H.  Certify this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1)(A) and 23(b)(2);

I.  Order an award of compensatory and punitive damages to Plaintiffs against Defendants to compensate them for their actual damages and for the humiliation, embarrassment, and emotional distress cause by Defendants' discriminatory actions;

J.  For economic damages, representing the intrinsic value and loss of use of Bella and Mimi, subject to proof and modification at trial;

K.  For special and general damages relating to the deprivation of Plaintiffs' property – Bella and Mimi;

L.  For noneconomic damages, including emotional distress and loss of enjoyment of life, subject to proof and modification at trial;`

M.  For veterinary expenses which may be needed for Bella and Mimi as a result of Defendants' acts;

N.  For future medical expenses pertaining to Plaintiffs' treatment for emotional distress as a result of defendants' acts;

O.  For punitive damages against Defendants;

P.  For reasonable attorney's fees and other litigation-related costs as allowed by law under 42 U.S.C. § 1988, or, in the alternative, statutory attorney's fees;

Q.  For costs of suit;

R.  For post judgment interest at the highest rate permitted by law;

S.  For such other and further relief as the Court may deem just and proper.

**JURY DEMAND:  PLAINTIFFS REQUEST A JURY TRIAL ON ALL MATTERS SO TRIABLE**

Dated: August 3, 2022

/s/ Richard Rosenthal
RICHARD BRUCE ROSENTHAL
*(pro hac vice)*
545 E. Jericho Turnpike
Huntington Station, NY 11746
(631) 629-8111 (telephone)
richard@thedoglawyer.com

/s/ Rebekah Lusk
Rebekah D. Lusk, Esq.
(Md Bar No. Bar 29353)
LUSK LAW, LLC
113 E. Church St.
Frederick, MD 21701
443-535-9715 (telephone)
rlusk@lusk-law.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2022 a copy of the foregoing First Amended Complaint

was filed electronically.  Notice of this filing will be sent to all parties by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.


/s/ Richard Rosenthal
RICHARD BRUCE ROSENTHAL